The above constitutes this Court's findings of fact and conclusions of law in this matter.

LOWER BRULE SIOUX TRIBE OF
SOUTH DAKOTA, Plaintiff,

v.

UNITED STATES of America; Harold Brown, Secretary of Defense; Clifford Alexander, Secretary of the Army; Lt. Gen. John W. Morris, Chief Engineer, Department of the Army, Corps of Engineers, Defendants.

Civ. No. 80–3047.

United States District Court,
D. South Dakota, C. D.

May 20, 1982.

R. Dennis Ickes, Salt Lake City, Utah, William J. Srstka, Jr., Duncan, Olinger, Srstka, Lovald & Robbennolt, P. C., Pierre, S. D., for plaintiff.

David L. Zuercher, Asst. U. S. Atty., Pierre, S. D., for defendants.

## MEMORANDUM OPINION

DONALD J. PORTER, District Judge.

### CASE SUMMARY

The Lower Brule Sioux Tribe brought this action seeking a declaration of its rights under the Act of October 3, 1962, Pub.L.No.87–734, 76 Stat. 698, which authorized the taking of certain lands of the Lower Brule Sioux Reservation for the Big Bend Dam and Reservoir Project on the Missouri River. The Tribe contends that the Secretary of the Army has ignored a mandate of the Act which directs the Secretary to revest in the Tribe previously condemned land that is not required for the Big Bend Project. Further, the Tribe contends that the Secretary of the Army has failed to implement a provision of the Act which grants the Tribe free grazing rights on those lands taken for the Big Bend Project. Both parties moved for a summary judgment. For the reasons which follow, the United States' Motion for Summary Judgment is granted, and the Tribe's Motion for Summary Judgment is denied.

### FACTUAL BACKGROUND

The Big Bend Dam and Reservoir Project was authorized as part of the comprehensive plan for flood control and protection of the Missouri River Basin, provided for in the Flood Control Act of 1944, 33 U.S.C. § 701–1 *et seq.* The project consists of an area of approximately 45,000 acres of land and water, stretching from Fort Thompson, South Dakota, to Pierre, South Dakota. Included in this acreage is 14,299.03 acres acquired from the Lower Brule Sioux Tribe pursuant to the Act of October 3, 1962, Pub.L.No.87–734, 76 Stat. 698. The principal purposes of the Act were to reimburse individual Indian landowners and the Lower Brule Sioux Tribe for the trust lands acquired by the United States for the construction of the Big Bend Dam and Reservoir on the Missouri River, to compensate the Tribe and its members for treaty and tribal damages, and to provide for the improvement of the social and economic conditions of the members of the Lower Brule

Sioux Tribe. *See* H.R.Rep.No.852, 87th Cong., 1st Sess. 6 (1961).

## DISCUSSION

### I. THE ACT'S REVESTMENT PROVISION

█ In Count I of its complaint the Tribe alleges that the Secretary of the Army has failed or refused to comply with Section 1(b) of the Act which provides:

(b) Upon a determination by the Secretary of the Army, within two years from the date of enactment of this Act, filed among the appropriate land records of the Department of the Interior, that any of the lands described in this Act are not required for Big Bend Project purposes, title to such land shall be revested in the former owner.

The Tribe contends that Section 1(b) imposed an affirmative obligation upon the Secretary to determine which lands within the 14,299.03 acres are not required for Big Bend Project purposes, and to revest any such land determined to be excess. The United States, on the other hand, contends that Section 1(b) authorized the Secretary to make a unilateral, discretionary determination as to the revestment of any land acquired by the Act, and that the Secretary did, in fact, make revestments pursuant to Section 1(b). Moreover, the United States contends that the Secretary's revestment authority was restricted by the two year statute of limitations contained in Section 1(b).

### A. *The Congressional Intent of The Act.*

The Tribe contends that Congress intended to treat the Big Bend taking differently than previous dam and reservoir takings. In determining the congressional intent of the Act, the Court is guided by the principles set forth in *Mattz v. Arnett,* 412 U.S. 481, 93 S.Ct. 2245, 37 L.Ed.2d 92 (1973), for ascertaining congressional intent in reservation diminishment cases. *See also Rosebud Sioux Tribe v. Kneip,* 430 U.S. 584, 97 S.Ct. 1361, 51 L.Ed.2d 660 (1977). The Court must examine "the face of the Act", the "surrounding circumstances", and the "leg-islative history". *Mattz v. Arnett,* 412 U.S. at 505, 93 S.Ct. at 2258.

### 1. *The Face of the Act.*

Determining what Congress intended by the language in Section 1(b) "[u]pon a determination by the Secretary of the Army" lies at the heart of this litigation. The Tribe contends that such language imposed an affirmative duty upon the Secretary to make a detailed study or determination as to whether there are any lands that are no longer required for project purposes. The Tribe suggests that the word "upon" as used here means "after" or "at the time", which connotes action by the Secretary. The United States argues that "upon" means "upon condition of" or "on the occasion of", and such definitions do not import a mandatory duty upon the Secretary to act. Moreover, had Congress intended to require a study or determination be made by the Secretary, the United States urges that it would have done so in customary language used when directing or mandating action, such as, "the Secretary of the Army shall determine" or "the Secretary of the Army shall make a detailed study to determine".

Also in dispute here is the language of Section 1(b) "within two years from the date of enactment of this Act." The Tribe contends that such language cannot be construed as a statute of limitations. Rather, the Tribe suggests that the phrases "within two years from the date of enactment of this Act, filed among the appropriate land records of the Department of the Interior", were used as modifiers of the principal command in the sentence, i.e., a "determination" by the Secretary. Accordingly, the Tribe argues that such language does not compel that a determination be made within two years, but was included merely as a directive to the Secretary to inform the Tribe within a reasonable time what land, if any, would be revested. A reasonable construction of the provision, in the Tribe's view, is that the Secretary should make a determination within two years, but if not accomplished within that period, then the obligation would continue until satisfied.

The United States contends that the modifying phrase was used to describe the action of the verb "determination", and therefore, clearly established a time limitation within which the Secretary could act. Moreover, even assuming the Secretary wanted to revest certain lands subsequent to the expiration of the two year period, the United States argues that such action would violate the United States Constitution.[1]

The meaning of the term "required" as it is used in the context of Section 1(b), i.e., "[u]pon a determination by the Secretary . . . that any of the lands described in this Act are not required for Big Bend Project purposes, . . ." is also at issue here. The Tribe contends that the Big Bend Dam Project was primarily designed to accomplish a limited purpose, namely the development of hydroelectric power, and that Congress intended to restrict the taking to those lands which were absolutely necessary for the construction, operation and maintenance of the dam and reservoir. Instead of revesting those lands which were not absolutely necessary for the production of hydroelectric power, the Tribe alleges that the Secretary has, in effect, unilaterally expanded the project purposes to include recreational and wildlife preserves so as to make use of all the lands acquired in the original taking. Such action, in the Tribe's view, was neither authorized nor intended by Congress.

Although hydroelectric power production may have been the primary purpose of the Big Bend Project, the United States contends that it was not the only purpose. As a project authorized by the Flood Control Act of 1944, the United States argues that the Big Bend Dam and Reservoir shared the same broad purposes of that Act, namely navigation, flood control, hydroelectric power production, irrigation, recreation, fish and wildlife conservation, domestic and industrial water supply, pollution abatement and silt control.

The Court is unable to determine Congress' intent from the face of the Act. The language employed by Congress is not so clear and unambiguous as to render the statutory interpretation posed by either party unreasonable. The Court is mindful of the judicially fashioned canons of construction that statutes passed for the benefit of dependent Indian tribes are to be liberally construed, and ambiguous expressions are to be resolved in favor of the Indians. *See Bryan v. Itasca County*, 426 U.S. 373, 96 S.Ct. 2102, 48 L.Ed.2d 710 (1976); and *Northern Cheyenne Tribe v. Hollowbreast*, 425 U.S. 649, 96 S.Ct. 1793, 48 L.Ed.2d 274 (1976). Before applying these rules of construction, however, the Court must go beyond the face of the Act and examine its legislative history and the circumstances surrounding its passage in an effort to determine Congressional intent.

### 2. *Legislative History.*

Major General Keith R. Barney, United States Army Corps of Engineers, testified before a Senate subcommittee to the following effect:

> [T]he Big Bend Project was authorized by the Flood Control Act approved Decem-

---

1. U.S.Const.Art. IV, § 3, Cl.2 provides:

    The Congress shall have power to dispose of and make all needful rules and regulations respecting the territory or other property belonging to the United States . . . .

    The United States Supreme Court has held that the constitutional power of Congress under this clause, vesting in it power to dispose of and make all needful rules respecting territory or other property belonging to the United States is without limitation and neither courts nor executive agencies may proceed contrary to an act of Congress in that area of national power. *U. S. v. California*, 332 U.S. 19 [67 S.Ct. 1658, 91 L.Ed. 1889] (1947). Moreover, the Supreme

    Court has stated that: "The disposal of public lands is not a subject over which the 'judicial power' of the United States is extended, but is a field in which the authority of Congress is supreme". *Standard Oil of California v. United States*, 107 F.2d 402 (7th Cir. 1939), citing *Lee v. Johnson*, 116 U.S. 48 [6 S.Ct. 249, 29 L.Ed. 570] (1885).

    The United States argues that the authority of the Secretary of the Army to revest any lands pursuant to § 1(b) was limited to two years after October 3, 1962, and therefore, the Secretary is without authority to act as demanded by the complaint of the Lower Brule Sioux Tribe.

ber 22, 1944, as a unit in the general comprehensive plan for flood control and other purposes in the Missouri River Basin. . . .

Big Bend was proposed in Senate Document 247 as one of the five new dams on the main stem of the Missouri River which, together with the Fort Peck Reservation upstream, would provide a six-reservoir main-stem system for flood control, irrigation, navigation, hydroelectric power, and other purposes. Big Bend was intended primarily as a power project, to develop the power head available in the Missouri River between Oahe and Fort Randall.

*Problems Arising From the Construction of Big Bend Dam, South Dakota* : Hearing before a Subcommittee of the Committee on Public Works, United States Senate, 86th Cong., 1st Sess. 12–13 (Feb. 16, 1959). General Barney further testified that, "[i]n final planning for Big Bend we have paid particular attention to how this project may best contribute to maximizing Missouri River power generation." *Id.* at p. 14.

The testimony of Colonel David G. Hammond, United States Army Corps of Engineers, supported that of Major General Barney:

[T]he purpose of Big Bend Dam is development of power. Development of all the fall of the river between Oahe Dam and Fort Randall Reservoir will result in maximum power production. Our planning has been directed toward such development, consistent with reasonable and economically justifiable handling of the land acquisition and relocation problems.

*Id.* at p.15. Further, in response to a question concerning the possibility of the Corps leasing flowage easements so landowners could keep their lands and continue to use those areas which were not inundated, Colonel Hammond testified that "[u]nder our current policy, our taking will include only a very narrow strip above the operating pool level. . . . [T]here will be very little, if any, land available for leasing back, because we do not expect to take any more than is required." *Id.* at 20.

In discussing the effects of changing the operating pool from a level of 1,414 feet to 1,422 feet, Colonel Hammond testified:

The aggregate effect of the 1,422 foot pool on recreation, wildlife, and scenic values is not greatly different, in our opinion, from the aggregate effect of the 1,414 pool. The 1,422 pool will inundate some recreation facilities, wildlife habitat, and scenic areas which would not be affected by the 1,414 pool.

*Id.* at 21. Colonel Hammond also noted that in the Corps studies of the Big Bend Project, navigation was given only limited consideration. *Id.*

The Tribe urges that the above quoted passages from the subcommittee hearings indicate Congress' intent to restrict the taking to those lands which were minimally required to achieve the project's primary purpose, i.e., the production of hydroelectric power. The Court agrees that Congress did not intend to take any more land than was necessary for the project. The Court, however, does not agree that the above quoted testimony manifests an intent to narrowly define the project's purposes. The testimony of the Corps of Engineers personnel was essentially an explanation of the Corps' decision to adopt a 1,422 foot pool elevation rather than a 1,414 foot pool elevation. The testimony explained the factors considered in establishing the pool elevation, and was not directed toward a definition of the project's purposes.

The principal purposes of the Act, as set forth in the House report, included reimbursing individual landowners and the Tribe for lands taken, compensating the Tribe for treaty and tribal damages, and providing for the improvement of social and economic condition of the Tribe. H.R.Rep. No.852, 87th Cong., 1st Sess. 6 (1961). The House report also explained that the Tribe was entitled to compensation for the indirect damages caused by the disruption of the Indian economy and the permanent loss of timber, wildlife and natural products. *Id.* at 10. In addition, the report noted that the taking of the bottom lands would deprive the Tribe of an important source of their livelihood. *Id.*

The Senate report explains that the bill contained the highest appropriation ever recommended for rehabilitation purposes. A generous rehabilitation program, however, was warranted in this instance because the Lower Brule Tribe had twice been called upon to give up its best bottom land for dam purposes. S.Rep.No.1636, 87th Cong., 2d Sess. 5 (1962). The Senate committee, like the House committee, also noted that the taking of the Tribe's bottom land would deprive the Tribe of an important source of their livelihood.

Unfortunately, the Act's legislative history reveals little, if any, evidence of the Congressional intent underlying Section 1(b). The above quoted passages from the House and Senate committee reports indicate Congress' awareness of the impact that the taking of these bottom lands would have on the Tribe's livelihood. The Committee reports, however, do not, as the Tribe suggests, express an intent to treat the Lower Brule Sioux Tribe differently than other Indian tribes affected by the construction of the Missouri River mainstem dams and reservoir projects. The only evidence of special treatment that can be gleaned from the legislative history is the large sum awarded to the Tribe as compensation for indirect damages.

The Court rejects the Tribe's contention that the Big Bend Dam and Reservoir was constructed for the sole purpose of producing hydroelectric power. Admittedly, the production of hydroelectric power was a primary purpose of the project, but to narrow the scope of the project to that limited purpose would be contrary to the multi-purpose concept for projects authorized by the Flood Control Act of 1944. There is nothing from the face of the Act, the legislative history or the surrounding circumstances indicating Congress' intent to construct a dam and reservoir project for such a limited purpose.

3. *Surrounding Circumstances.*

The Big Bend Dam and Reservoir was one of the five new dams on the main stem of the Missouri River which, together with the Fort Peck Reservoir upstream, would provide a six-reservoir main-stem system for flood control, irrigation, navigation, hydroelectric power, and other purposes. *Problems Arising From the Construction of Big Bend Dam, South Dakota* : Hearing before a Senate Subcommittee of the Committee on Public Works, 86th Cong., 1st Sess. 12–13 (Feb. 16, 1959). Big Bend was the last unit of the main-stem system.

The Lower Brule Sioux Tribe is one of five tribes in South and North Dakota from whom substantial acreages were taken for the Missouri River Basin Project. Prior to the Big Bend taking, Indian trust lands were taken from the Fort Berthold Tribe for the Garrison Dam, from the Cheyenne River and Standing Rock Sioux Tribes for the Oahe Dam, and the Crow Creek and Lower Brule Sioux Tribes for the Fort Randall Dam. The Big Bend taking act was patterned primarily after the Cheyenne River and Standing Rock taking acts. H.R. Rep.No.852, 87th Cong., 1st Sess. 7 (1961).

The pertinent language from the Fort Berthold taking act indicated that Congress was taking "all right, title and interest . . . in and to the lands constituting the taking area described . . ." and that such title "shall vest the United States of America". Act of October 29, 1949, Pub.L.No.437, 63 Stat. 1026. The Act, however, did not provide for any form of revesting or acreage adjustments.

The Cheyenne River taking conveyed "all . . . lands or interest within said Cheyenne River Reservation . . . which lands are required . . . for the . . . Oahe Dam, including such lands along the margin of said proposed reservoir as may be required by the Chief of Engineers . . . for the construction, protection, development, and use of said reservoir . . . subject, however, to the conditions of this agreement . . . ." Act of September 3, 1954, Pub.L.No. 83–776, 68 Stat. 1191. The Act went on to specifically describe the precise lands taken, and no acreage adjustments or revesting provisions were included.

The language of the Standing Rock taking statute stated that "title to the entire

interest, excluding [certain mineral interests] are hereby taken by the United States for the Oahe Project .... " The Act also provided, at section 1(b), that "upon a determination by the Secretary of the Army ... that any of the lands described in this Act are not required for Oahe Project purposes, title to such lands shall be revested in the former owner .... " Further, Section 1(c) provided that "if the Secretary of the Army determines that additional Indian lands ... are required for project purposes, he may acquire such lands by purchase with the approval of the Secretary of the Interior, or by condemnation." Act of September 2, 1958, Pub.L.No.85–915, 72 Stat. 1762.

In short, the Tribe contends that the pre-Big Bend taking acts either took specific lands without an opportunity for acreage adjustment and revestment (Fort Berthold and Cheyenne River) or if the act contained acreage adjustment and revestment provisions it also contained a provision allowing the Secretary to acquire even more land (Standing Rock). The Tribe, noting that the Fort Berthold, Cheyenne River and Standing Rock Tribes were only affected by one dam and reservoir taking while the Lower Brule and Crow Creek Tribes were subjected to yet a second taking, argues that Congress was well aware of the hardship that would result from a second taking of the Tribe's valuable river bottom lands. Thus, in the Tribe's view, Congress intended to strictly limit the taking to those lands that were absolutely required for the construction, operation, and maintenance of the dam and reservoir. Accordingly, Congress authorized the taking of a maximum amount of land, and then directed the Secretary of the Army to revest those lands that were not required for the project's limited purpose, i.e., hydroelectric power production.

The circumstances surrounding the enactment of the Big Bend taking act do not convince this Court that Congress intended to treat the Lower Brule Sioux Tribe differently than other Indian tribes affected by land takings for the Missouri River mainstem dam and reservoir projects. Congress was obviously aware of the hardship that all of the affected tribes would suffer from the loss of their precious Missouri River bottom lands. Notwithstanding Congress' inclusion of a provision for revestment of excess lands, it is also evident that because the Lower Brule Sioux Tribe had lost much of its river bottom land in the prior Fort Randall Dam and Reservoir Project, Congress intended that a minimum amount of land be taken for the Big Bend Project.

The revestment provision contained in the Big Bend taking act was similar to the Standing Rock taking act except the latter act also gave the Secretary of the Army the authority to condemn additional lands. The Court rejects the Tribe's contention that the deletion from the Big Bend taking act of the Secretary's authority to take additional land suggests that special treatment was intended for the Lower Brule Sioux Tribe. Congress was obviously aware of the difficulty in determining exactly how much land would be required for the Big Bend Dam and Reservoir. Although Congress authorized the taking of a maximum amount of acres for the project, and removed the Secretary's discretion to acquire additional land, it undoubtedly did so mindful of the Act's multi-purposes and with the intent that such land would be used for all project purposes, not just for hydroelectric power production.

According to an affidavit[2] of Arvid L. Thompsen, Chief of the Planning Division of the Omaha District, United States Corps of Engineers, the Corps prepared a master plan in February, 1964, describing the proposed use of all lands within the Big Bend Dam/Lake Sharpe Project. "Missouri River Big Bend Dam-Lake Sharpe, South Da-

---

**2.** The affidavits referred to herein were submitted in support of the United States' Motion for Summary Judgment. Manager of Title and Records Section of the Bureau of Indian Affairs, Aberdeen, South Dakota, the Corps of Engineers, pursuant to section 1(b), revested two parcels of land to the Tribe for the relocation of Indian cemeteries. The Court, however, views these revestments as an attempt to comply with sections 4 and 6, which direct the Secretary to relocate and reestablish Indian cemeteries within the taking area.

kota Design Memorandum No. MB–16b Master Plan" (Feb. 1964). Although counsel for the Corps of Engineers stated in oral argument that the master plan was not submitted to comply specifically with Section 1(b) of the Act, the Corps did make a review of land holdings at the Big Bend Dam/Lake Sharpe Project during preparation of the master plan in February of 1964. This was within the two year time limitation set forth in Section 1(b) for revesting excess land. It was determined at that time that all of the land acquired for the project was needed both for present good faith determination, as evidenced by the master plan, that all of the 14,299.03 acres acquired by the Act were needed either for present or future project purposes and, thus, there would be no revestment of lands.

The Court also construes Section 1(b) as placing a two year statute of limitations upon the Secretary's duty to revest excess lands. As stated earlier, Congress was obviously aware of the difficulty in determining the precise acreage required for the project's multi-purposes. Thus it would be unreasonable to assume that Congress intended the Corps to revest all land that was not in actual use for a project purpose within two years after October, 1962. Inasmuch as Congress authorized the taking of only a minimal amount of land for the project and placed a two year statute of limitations upon the Secretary's authority to revest excess lands, it is reasonable to assume that Congress expected that any such revestments would be minimal or nonexistent.

In summary, the Court finds that the Secretary of the Army made a determination, pursuant to Section 1(b), that all of the lands acquired for the Big Bend Dam were required for present or future project purposes. Further, this determination was made within the two year statute of limitations contained in Section 1(b) and the Secretary is no longer under a duty to make any further determinations of excess lands.

For the foregoing reasons, defendant's Motion for Summary Judgment as to Count I is granted.

## II. THE ACT'S GRAZING PROVISION

■ In Count II of the complaint, the Tribe contends that the Secretary of the Army has failed or refused to give effect to Section 10 of the Act of October 3, 1962, which provides in pertinent part:

Sec. 10. Subject to the right of the United States to occupy, use, and control trust and restricted lands acquired by this Act and heretofore acquired in condemnation action Civil No. 335 for the construction, operation, and maintenance of the Big Bend Dam and Reservoir Project pursuant to the Flood Control Act of 1944, approved December 22, 1944, and amendatory laws, as determined necessary by the Secretary of the Army adequately to serve said purposes, the Lower Brule Sioux Tribe shall be permitted, after the Big Bend Dam gates are closed and the waters of the Missouri River impounded, to graze stock without charge *on such of the land described in this section* as lies between the level of the Reservoir and the taking line described at Section 16 of this Act and as the Secretary of the Army determines is not devoted to other beneficial uses, and to lease such land for grazing purposes to members or non-members of the Tribe on such terms and conditions as the Secretary of the Interior may prescribe.... (emphasis added).

The particular language in dispute here is "on such of the lands described in this section." The United States contends that section 10 restricts the Tribe's grazing privilege to trust and restricted land acquired by the Act of October 3, 1962. The Tribe, however, contends that section 10 granted the Tribe free grazing privileges along the entire length of the Big Bend Project, whether the land was taken by the Act or otherwise.

### A. *The Face of the Act.*

In determining the extent of the Tribe's grazing privileges, it is necessary to examine what land is described in section 10.

Section 10 refers to "trust and restricted land acquired by this Act and heretofore acquired in condemnation action Civil numbered 335 . . . ." One must then turn to Section 16 to determine what lands were acquired by the Act and through condemnation proceedings.

Section 16 provides:

The land taken by section 1 of this Act, embracing approximately 14,299.03 acres, and the land heretofore acquired in condemnation proceedings by Civil numbered 335, embracing approximately 310.00 acres, are the lands identified and delimited on a map entitled "A Map Delimiting Tribal Individual Trust and Restricted Land of the Lower Brule Sioux Reservation Acquired by the United States for the Big Bend Dam and Reservoir Project for the Sum of $825,000. . . .

Although it is not necessary, in this Court's view, to look beyond the words of section 10 to ascertain its meaning,[3] the Act's legislative history will also be analyzed.

B. *Legislative History.*

The Act of October 3, 1962, was originally introduced as H.R. 5144 and provided at section 10:

Sec. 10. The Tribe is hereby granted the exclusive right, without cost to use for grazing purposes all lands owned by the United States between the shore line of the Big Bend Reservoir and the exterior boundary of the Big Bend Project within the Reservation, effective after the Big Bend Dam gates are closed and waters of the Missouri River impounded. Notwithstanding any other provision of law, the same right is confirmed and extended to all land owned by the United States between the shoreline of the Fort Randall Reservoir and the exterior boundary of the Fort Randall Project within the Reservation.

The House Committee on Interior and Insular Affairs amended H.R. 5144, and the pertinent portion of section 10 was amended as follows:

[T]he Lower Brule Sioux Tribe and the individual members thereof shall be permitted . . . to graze stock without charge for a period of five years on such of the land described in this section as lies between the level of the Reservoir and the taking line described in Section 16 of this Act . . . .

H.R.Rep.No.852, 87th Cong., 1st Sess. 4 (1961).

House Report No. 852 contains letters from both the Under-Secretary of the Interior and the Secretary of the Army, commenting on H.R.5144 as it was originally introduced. In a letter dated May 19, 1961, the Under-Secretary of the Interior stated:

In addition, the bill gives to the Indians the following rights: . . . 5. To use exclusively, without charge for grazing purposes *all* land between the shoreline and the exterior boundary of both the Big Bend and Fort Randall projects within the reservation . . . .

H.R.Rep.No.852, 87th Cong., 1st Sess. 21 (1961) (emphasis added).

The Secretary of the Army, in a letter dated May 19, 1961, stated: "The bill would authorize . . . (10) a grant to the tribe of an exclusive right, without cost, for grazing stock . . . on *all* land between the shoreline and the exterior boundary of the project within the reservation . . . ." *Id.* at 26 (emphasis added). It was the opinion of the Department of the Army that section 10, by granting the Tribe the exclusive right to graze stock "on all lands owned by the United States within the Reservation and declared for the project without regard to previous ownership . . ." extended far beyond the normal objective of this type of legislation. *Id.* at 31. In that same letter, the Secretary recommended that H.R.5144 be amended as follows: "[T]he Lower Brule Sioux Tribe . . . shall be permitted . . . to graze stock on the land between the level of the reservoir and the taking line, as described in Section 16 of this Act . . . ." *Id.* at 33.

---

**3.** *Tennessee Valley Authority v. Hill,* 437 U.S. 153, 184 n.29, 98 S.Ct. 2279, 2296 n.29, 57 L.Ed.2d 117 (1978) (when confronted with a statute which is plain and unambiguous on its face, courts ordinarily do not look to legislative history as a guide to its meaning).

The House Committee on Interior and Insular Affairs completely amended H.R. 5144 as originally introduced, and recommended the amended bill for passage in H.R.Rep.No.852. That report refers to section 10 as conferring upon the Tribe the right to "graze stock without charge . . . *on the former trust land* acquired by the United States between the water level of the reservoir and the taking land . . . ." *Id.* at 8 (emphasis added).

H.R.5144 was referred to the Senate and the Senate Committee on Interior and Insular Affairs recommended that H.R.5144 be amended and passed. S.Rep.No.1636, 87th Cong., 2d Sess. (1962). The recommended revisions to section 10, as were passed by the House, do not pertain to the issue here. The Senate Report makes reference to section 10 as conferring on the Tribe the right to "graze stock without charge *on the former trust land* acquired by the United States between the water level of the reservoir and the taking line . . ." *Id.* at 6 (emphasis added).

The legislative history pertaining to section 10 demonstrates that Congress intended to narrow the scope of the Tribe's grazing rights from *all* lands between the shoreline of the Reservoir and the exterior boundary of the taking area within the reservation to the trust and restricted lands acquired by the Act of October 3, 1962, and the lands included in condemnation proceedings, civil number 335. In short, the plain and unambiguous language of section 10 is supported by the legislative history and the Tribe's attempt to broaden the scope of the grazing privileges conferred by section 10 is unwarranted.

For the foregoing reasons, the United States' Motion for Summary Judgment as to Count II is granted.