## NORTHERN CHEYENNE TRIBE *v.* HOLLOWBREAST ET AL.

No. 75–145.   Argued March 29, 1976—Decided May 19, 1976

BRENNAN, J., delivered the opinion for a unanimous Court. BLACKMUN, J., filed a concurring opinion, *post,* p. 660.

*Steven H. Chestnut* argued the cause and filed briefs for petitioner.

*Lewis E. Brueggemann* argued the cause and filed a brief for the respondent class of Northern Cheyenne Indians. *Steven L. Bunch* argued the cause *pro hac vice* for respondents Williamson et al., and with him on the brief was *Neil Haight.*

MR. JUSTICE BRENNAN delivered the opinion of the Court.

The question to be decided is whether the Northern Cheyenne Allotment Act, Act of June 3, 1926, 44 Stat. 690, gave the allottees of surface lands vested rights in the mineral deposits underlying those lands. The District Court for the District of Montana held that the Act did not grant the allottees vested rights in the mineral deposits. 349 F. Supp. 1302 (1972). The Court of Appeals for the Ninth Circuit reversed. 505 F. 2d 268 (1974). We granted certiorari. 423 U. S. 891 (1975). We agree with the District Court and reverse.

I

The 1926 Act statutorily established the Northern Cheyenne Reservation pursuant to the federal policy expressed in the General Allotment Act of 1887, 24 Stat. 388,[1] and provided for the allotment of tracts of land

---

[1] The objects of this policy were to end tribal land ownership and to substitute private ownership, on the view that private ownership by individual Indians would better advance their assimilation as self-supporting members of our society and relieve the Federal Government of the need to continue supervision of Indian affairs. See Comment, Tribal Self-Government and the Indian Reorganization Act of 1934, 70 Mich. L. Rev. 955, 959 (1972).

to individual tribal members. Section 1 of the Act declared the lands constituting the reservation "to be the property of [the Northern Cheyenne] Indians, subject to such control and management of said property as the Congress of the United States may direct." Section 2 set up a procedure for allotment of agricultural and grazing lands. Section 3, 44 Stat. 691, upon which the question for decision in this case turns, reads as follows:

"That the timber, coal or other minerals, including oil, gas, and other natural deposits, on said reservation are hereby reserved for the benefit of the tribe and may be leased with the consent of the Indian council under such rules and regulations as the Secretary of the Interior may prescribe: *Provided*, That at the expiration of fifty years from the date of the approval of this Act the coal or other minerals, including oil, gas, and other natural deposits, of said allotments shall become the property of the respective allottees or their heirs: *Provided further*, That the unallotted lands of said tribe of Indians shall be held in common, subject to the control and management thereof as Congress may deem expedient for the benefit of said Indians."

On its face, § 3 provides that title to the mineral deposits would pass to the allottees, or their heirs,[2] 50 years after approval of the Act, or in 1976. But the

---

[2] In 1961 Congress amended the Act to add the allottees' devisees as beneficiaries. Act of Sept. 22, 1961, Pub. L. 87–287, 75 Stat. 586. At the same time Congress amended § 3 to permit the Tribe to lease mineral rights beyond 1976 and provided that any interest that might be taken by the allottees would be "subject to any outstanding leases." Congress also prohibited the allottees from conveying their future interest and voided any conveyances entered into prior to 1961. Previously § 3 had been amended to grant the allottees the timber on the allotted lands. Act of July 24, 1947, c. 314, 61 Stat. 418.

phrasing might also be read to imply a reserved power in Congress to terminate the allottees' interest before that date. Thus, the critical question is whether Congress could, as it purports to have done in 1968, terminate the grant without rendering the United States constitutionally liable to pay the allottees just compensation.

A supervening event of particular significance was the considerable increase in value of coal reserves under the allotted lands that occurred in the 1960's due to increasing energy demand and the concomitant need for new sources of energy.[3] Until this occurred, the reservation of the deposits until 1976 for the benefit of the Tribe had not significantly benefited it, because mining of most of the coal was not economically feasible. There was also substantial concern that, because one-third of the allottees did not live on the reservation, if control of strip mining passed in 1976 to the individual allottees, serious adverse consequences might be suffered by the Indians living on the reservation. In addition, Congress believed that injustice might result if the benefits to be realized by individual Indians depended upon whether coal was found under particular allotted lands. S. Rep. No. 1145, 90th Cong., 2d Sess., 2 (1968); H. R. Rep. No. 1292, 90th Cong., 2d Sess., 2 (1968). These considerations led Congress in 1968 to terminate the grant to allottees and to reserve the mineral rights "in perpetuity for the benefit of the Tribe." Act of July 24, 1968, Pub. L. 90–424, 82 Stat. 424.[4] The termination

---

[3] Petitioner informs us that its "conservative" estimate of the value of the coal reserves is $2 billion, based on a recent offer for coal under the Crow Reservation, which adjoins the Northern Cheyenne Reservation.

[4] The full text of § 3, as amended, is:

"(a) The coal or other minerals, including oil, gas, and other natural deposits, on said reservation are hereby reserved in perpetuity for the benefit of the tribe and may be leased with the consent of the

was, however, expressly conditioned upon a prior judicial determination that the allottees had not been granted vested rights to the mineral deposits by the 1926 Act. Congress so conditioned the termination to avoid the possibility of a successful claim for damages against the United States by the allottees under the Just Compensation Clause of the Fifth Amendment. The 1968 amendment authorized the Tribe to commence an action against the allottees in the District Court for Montana "to determine whether under [the 1926 Act] the allottees, their heirs or devisees, have received a vested property right in the minerals which is protected by the fifth amendment," and provided that the reservation of the minerals in perpetuity for the benefit of the Tribe "shall cease to have any force or effect" if the court determines that "the allottees, their heirs or devisees, have a vested interest in the minerals which is protected by the fifth amendment." [5]

---

Indian council for mining purposes in accordance with the provisions of the Act of May 11, 1938 (52 Stat. 347; 25 U. S. C. [§] 396a–f), under such rules, regulations, and conditions as the Secretary of the Interior may prescribe.

"(b) The unallotted lands of said tribe of Indians shall be held in common, subject to the control and management thereof as Congress may deem expedient for the benefit of said Indians."

Congress rejected the possibility of extending the Tribe's interest for a term of years, rather than in perpetuity, on the recommendation of the Department of the Interior. The Department took the view that an extension for a number of years—the original bill proposed 42 years—would create difficult and costly administrative problems in determining the heirs of the allottees; Congress accordingly extended the interest in perpetuity. H. R. Rep. No. 1292, 90th Cong., 2d Sess., 2 (1968); S. Rep. No. 1145, 90th Cong., 2d Sess., 2 (1968).

[5] Section 2 of the amendment, 82 Stat. 425, provides as follows:

"The Northern Cheyenne Tribe is authorized to commence in the United States District Court for the District of Montana an action against the allottees who received allotments pursuant to the Act of June 3, 1926, as amended, their heirs or devisees, either indi-

## II

Both the Tribe and the allottees argue that the plain meaning of § 3 of the 1926 Act, providing that the mineral deposits "shall become the property of the respective allottees" 50 years after the effective date of the Act, compels a declaratory judgment in their favor. The Tribe argues that this provision can only be read to grant an expectancy, while the allottees maintain that it unequivocally grants a vested future interest.[6] Both in-

vidually or as a class, to determine whether under the provisions of the Act of June 3, 1926, as amended, the allottees, their heirs or devisees, have received a vested property right in the minerals which is protected by the fifth amendment. The United States District Court for the District of Montana shall have jurisdiction to hear and determine the action and an appeal from its judgment may be taken as provided by law. If the court determines that the allottees, their heirs or devisees, have a vested interest in the minerals which is protected by the fifth amendment, or if the tribe does not commence an action as here authorized within two years from the date of this Act, the first section of this Act shall cease to have any force or effect, and the provisions of section 3 of the Act of June 3, 1926, as amended by the Acts of July 24, 1947, and September 21 [sic], 1961, shall thereupon be carried out as fully as if section 3 had not been amended by this Act."

The Tribe sued 10 allottees, individually and as representatives of the class of allottees, heirs, and devisees, and sought a declaratory judgment that the class had no vested rights and that the Tribe owned the coal and other minerals in perpetuity. We shall refer to the class as "allottees."

[6] Respondents Williamson and Bowen also argue that the unusual review provision accompanying the 1968 amendment evidences "a *formidable Congressional apprehension*" concerning the constitutionality of extending the Tribe's interest in perpetuity. On the contrary, Congress merely recognized that a plausible argument might be made on behalf of the allottees and desired its merit to be judicially determined. The House Committee, however, expressly stated its belief that the allottees had only an expectancy. H. R. Rep. No. 1292, *supra*, at 3. Moreover, the concerns assertedly felt by Congress in 1968 undoubtedly were not present in 1961;

terpretations are consistent with the wording of the Act, and we therefore must determine the intent of Congress by looking to the legislative history against the background of principles governing congressional power to alter allotment plans.

The District Court agreed with the Tribe, reading "unallotted lands" in § 3 as including the mineral deposits, since the Act expressly severed the mineral deposits from the surface of the allotted lands and subjected unallotted lands "to the control and management thereof as Congress may deem expedient for the benefit of said Indians." 349 F. Supp., at 1309–1310. The Court of Appeals rejected the District Court's interpretation of "unallotted lands" as including the severed mineral deposits, rendering them subject to congressional control and management; rather, it read § 3 to be an "unconditional, noncontingent grant of [the mineral] deposits to the allottees," and noted the absence of any "clear expression of Congress's retained power." 505 F. 2d, at 271–272.

The Court of Appeals erred in its basic approach to construction of the 1926 Act. Its view was that Congress must be regarded as having relinquished its control over Indian lands in the absence of an express statement of its intent to retain the power.[7] Just the opposite is true. The Court has consistently recognized

in that year Congress gave the Tribe authority to encumber the allottees' interest by signing long-term leases, expanded the class of beneficiaries to include devisees, and prohibited the allottees from conveying their future interests. See n. 2, *supra*.

[7] The court also relied on the canon that "statutes passed for the benefit of the Indians are to be liberally construed and all doubts are to be resolved in their favor." 505 F. 2d, at 272. But this eminently sound and vital canon has no application here; the contesting parties are an Indian tribe and a class of individuals consisting primarily of tribal members.

the wide-ranging congressional power to alter allotment plans until those plans are executed. *E. g., Chase* v. *United States,* 256 U. S. 1, 7 (1921); *United States* v. *Rowell,* 243 U. S. 464, 468 (1917); *Sizemore* v. *Brady,* 235 U. S. 441, 449–450 (1914); *Gritts* v. *Fisher,* 224 U. S. 640, 648 (1912); *Stephens* v. *Cherokee Nation,* 174 U. S. 445, 484 (1899). This principle has specifically been applied to uphold congressional imposition on allottees of restraints against alienation of their interests or expansion of the class of beneficiaries under an allotment Act. *E. g., United States* v. *Jim,* 409 U. S. 80 (1972); *Brader* v. *James,* 246 U. S. 88 (1918). The extensiveness of this congressional authority, as well as "Congress' unique obligation toward the Indians," *Morton* v. *Mancari,* 417 U. S. 535, 555 (1974), underlies the judicially fashioned canon of construction that these statutes are to be read to reserve Congress' powers in the absence of a clear expression by Congress to the contrary. *Chippewa Indians* v. *United States,* 307 U. S. 1, 5 (1939).

Read in this light, the statutory history of the Northern Cheyenne Reservation allotment supports the District Court's reading of the Act. Although prior to 1925 allotment Acts had been enacted for nearly all Indian reservations, none yet applied to the Northern Cheyenne Reservation. The Tribe in 1925 petitioned Senator Walsh of Montana to have the reservation allotted. The petition read in pertinent part:

> "We, the undersigned members of the Northern Cheyenne Indian Tribe, of the State of Montana, do hereby humbly beseech you to do all in your power to have a Bill introduced and passed in Congress, to have an allotment of not less than 320 acres of tillable farm land made to each and every member of the Northern Cheyenne Indians.
>
> "To reserve all mineral, timber, and coal lands

for the benefit of the Northern Cheyenne Indian Tribe, said tribe to have absolute control of same."

Thus, the Tribe from the outset sought allotment provisions that would retain, for the benefit of the entire Tribe, the rights to the coal and other minerals underlying the reservation.

Shortly thereafter Hubert Work, Secretary of the Interior, sent Representative Leavitt of Montana, Chairman of the House Committee on Indian Affairs, a proposed draft of an allotment bill for the Northern Cheyenne Reservation. An accompanying letter reiterated the Tribe's desire to give individual Indians agricultural and grazing lands. Secretary Work also suggested that a survey of the land be made and further proposed that "[i]n the event any of the land listed for allotting is found to contain coal or other minerals, it is contemplated to reserve all such minerals for the tribe and to allot the surface only." H. R. Rep. No. 383, 69th Cong., 1st Sess., 2 (1926).

The proposed bill (H. R. 9558) introduced in the House two days later by Representative Leavitt followed this suggestion. Section 2 of this bill provided for a geological survey and required that

> "if any of the land shall be found to contain coal or other minerals, only the surface thereof may be allotted, and all minerals on said lands are hereby reserved for the benefit of the tribe."

This language is clear evidence of an intent to sever the surface estate from the interest in the minerals, at least wherever minerals are found to exist. But nothing appears in the legislative history explaining the object of the proviso:

> "*Provided,* That at the expiration of fifty years from the date of the approval of this Act, the coal

or other mineral deposits of said allotments shall become the property of the respective allottees or their heirs or assigns."

We are persuaded for several reasons that it was not intended to grant the allottees a vested future interest in the mineral deposits and thereby relinquish congressional "control and management thereof as Congress may deem expedient for the benefit of said Indians."

The proposed bill plainly reveals a purpose to sever the mineral rights from the surface estate; "only the surface . . . may be allotted" under the bill. In fact, the limited object of the bill, as stated in its title, was "to provide for allotting in severalty agricultural lands" within the reservation. This limited object carries out Secretary Work's suggestion, and honors the Tribe's request, to limit the allotment to the surface lands to enable the Tribe to enjoy the full benefit of the mineral rights. Nothing in the legislative history shows any congressional purpose not to follow the Secretary's proposal; every indication is to the contrary.[8] Only the surface lands were to be subject to allotment. The House Committee's amendments to the bill make this purpose even clearer; the Committee retained the language that limited the allotment to surface lands but omitted the language imposing this limitation only in the event that minerals were found on the land.[9] H. R.

---

[8] Documents on deposit in the National Archives show that Representative Leavitt's proposed bill was identical to the Secretary's draft, and the 50-year provision is thus even more clearly not intended to grant vested rights. Secretary Work's summary of the draft bill stated the intention "to reserve all . . . minerals for the tribe" and did not mention the allottees' future interest.

[9] The bill as reported by the Committee, with the deleted language in brackets, reads:

"[and if any of the land shall be found to contain coal or other minerals,] only the surface of any lands in this reservation may be

Rep. No. 383, *supra,* at 1. The House passed the bill as amended by the Committee. 67 Cong. Rec. 6522 (1926).

The Senate Committee reported out the House bill with several amendments, two of which have significance in support of our conclusion. S. Rep. No. 638, 69th Cong., 1st Sess. (1926). A new opening section, eventually § 1 of the Act, see *supra,* at 651, confirmed the Tribe's title to the reservation lands and expressly retained Congress' authority to manage those lands. The Committee also rewrote § 2 of the House bill and substituted the following as § 3 of its bill:

> "That the timber, coal or other minerals, including oil, gas, and other natural deposits on said reservation, are hereby reserved for the benefit of the tribe: *Provided,* That at the expiration of fifty years from the date of the approval of this act the coal or other minerals, including oil, gas, and other natural deposits of said allotments shall become the property of the respective allottees or their heirs: *Provided further,* That the unallotted lands of said tribe of Indians shall be held in common, subject to the control and management thereof as Congress may deem expedient for the benefit of said Indians."

The changes from the House bill indicate no difference in purpose. The coal and other mineral rights were still "reserved for the benefit of the tribe," with no suggestion from the Senate Committee that it attached any more import to the 50-year provision than had the House. Most significantly, and a critical fact supporting the District Court's construction of § 3, the Committee added an express reservation of congressional authority

---

allotted, and all minerals on said lands are hereby reserved for the benefit of the tribe . . . ."

The balance of the provision was unchanged. See *supra,* at 657.

over "unallotted lands." [10]   Since the House bill clearly allotted only the surface lands, we are compelled to conclude that when both Houses adopted the bill as amended by the Senate, "unallotted lands" in § 3 included the mineral deposits.   See *British-American Oil Co.* v. *Board of Equalization,* 299 U. S. 159, 164–165 (1936).[11]

The conclusion we reach is also supported by the wording of the allotment trust patents.   The patents "reserved for the benefit of the Northern Cheyenne Indians, all the coal or other minerals, including oil, gas, and all natural deposits in said land," without any reference to the allottees' future interest.   Thus, the agency charged with executing the Act construed it as not granting the allottees any vested rights.   "While not conclusive, this construction given to the [allotment] act in the course of its actual execution is entitled to great respect." *La Roque* v. *United States,* 239 U. S. 62, 64 (1915).   See *United States* v. *Jackson,* 280 U. S. 183, 193 (1930); *Assiniboine & Sioux Tribes* v. *Nordwick,* 378 F. 2d 426, 432 (CA9 1967), cert. denied, 389 U. S. 1046 (1968).

*Reversed.*

Mr. Justice Blackmun, concurring.

For me, and obviously for the Congress, this case is much closer and the legislative history much less clear

---

[10] The bill was also amended before final passage to permit the Tribe to lease the reserved mineral estates, 67 Cong. Rec. 9735 (1926), and to require that all income from the minerals be held by the United States for the benefit of the Tribe, *id.,* at 9962.

[11] A reasonable explanation for the provision that the mineral rights would become the property of the allottees after 50 years is that it may have been thought to further the policy of assimilation underlying the allotment policy, see n. 1, *supra;* the provision is consistent with a desire to give the mineral rights to the allottees after they became assimilated.   On the other hand, the vesting of an irrevocable future interest in 1926 would not be wholly consistent

than the Court's opinion makes them out to be. There are factors that distinctly favor the respondents. For one example, in other comparable statutes, there are *specific* reservations (*e. g.,* "unless otherwise provided by Congress") of the kind of congressional power that the Court finds implicit here. Our National Legislature obviously knew how expressly to reserve the power and yet did not employ the "magic words" here. On balance, however, the strength of the case rests with the petitioner. It is of some importance, I feel, that the minerals could have been leased and depleted during the 50-year period. This possibility surely diminishes the reliance interest of any allottee and his successors. I therefore join the Court's opinion and its judgment.

---

with that policy, particularly since the policy as reflected in allotment statutes was already losing its appeal by 1926, and Congress might more logically be expected to have been reluctant to surrender its power to modify the Act.