712 F.2d 349
 LOWER BRULE SIOUX TRIBE OF SOUTH DAKOTA, Appellant,
v.
UNITED STATES of America; Harold Brown, Secretary of
Defense; Clifford Alexander, Secretary of the Army; Lt.
Gen. John W. Morris, Chief Engineer, Department of the Army,
Corps of Engineers, Appellees.
 No. 82-1749.
 United States Court of Appeals,
Eighth Circuit.
 Submitted March 15, 1983.
Decided July 19, 1983.
 
 1
 Carol E. Dinkins, Asst. Atty. Gen., Washington, D.C., Philip N. Hogen, U.S. Atty., Sioux Falls, S.D., David L. Zuercher, Asst. U.S. Atty., Pierre, S.D., Dirk D. Snel, Edward J. Shawaker, Dept. of Justice, Washington, D.C., for appellees.
 
 
 2
 R. Dennis Ickes of R. Dennis Ickes, P.C., Salt Lake City, Utah, and William J. Srstka, Jr., of Duncan, Olinger, Srstka, Lovald & Robbenholt, P.C., Pierre, S.D., for appellant.
 
 
 3
 Before HEANEY and FAGG, Circuit Judges, and MAGNUSON,* District Judge.
 
 
 4
 MAGNUSON, District Judge.
 
 
 5
 The Lower Brule Sioux Tribe brought an action in the United States District Court for the District of South Dakota seeking a determination of its rights under the Act of October 3, 1962, Pub.L. No. 87-734, 76 Stat. 698 (1962) (hereinafter the Big Bend Act). The Tribe sought a declaration that the revestment provision of Section 1(b) of the Act required that the Secretary of the Army conduct a study to determine whether the Army Corps of Engineers had taken tribal lands for the Big Bend Dam and Reservoir in excess of project requirements. The Tribe also sought damages, claiming a loss of income as a consequence of the Secretary's failure to revest land taken for allegedly unauthorized park and recreational uses.
 
 
 6
 In Count II of its complaint, the Tribe sought a declaration that Section 10 of the Act entitled the Lower Brule Sioux Tribe to free grazing rights on all lands taken for the Big Bend Project, and not merely on former Tribal lands.
 
 
 7
 Both parties moved for summary judgment. The district court[1] granted defendants' motion for summary judgment on both counts. As to Count I, the court found that the filing of the Master Plan (Design Memorandum No. MB-16B (Feb. 1964)) satisfied the requirements of Section 1(b). The court further held that the two-year provision of Section 1(b) was intended as a limitation on the Secretary's duty and authority to revest title. As to Count II, the court found that Section 10 of the Act clearly expressed a Congressional intent to grant free grazing rights only on those lands which had previously been trust lands of the Tribe. Although we find it unnecessary to rule on the two-year provision of Section 1(b), we are in substantial agreement with the interpretation and analysis of the district court, and we affirm on both counts.
 
 FACTUAL BACKGROUND
 
 8
 By the Big Bend Act, Congress authorized the taking of 14,299.03 acres of land from the Lower Brule Sioux Reservation for the construction of the Big Bend Dam and Reservoir Project.[2] The Big Bend Project is part of the larger Missouri River Basin Project, a comprehensive flood-control plan authorized by the Flood Control Act of 1944, Pub.L. No. 78-534, 58 Stat. 887. The Big Bend Dam is the last of a series of dams built under the Missouri River Basin Project, and encompasses 45,000 acres of land and water stretching from Fort Thompson, South Dakota, to Pierre, South Dakota. The stated purposes of the Big Bend Act are to provide for the acquisition of and payment for tribal lands required for the dam and reservoir project, and for the rehabilitation, social and economic development of the members of the Lower Brule Sioux Tribe.
 
 COUNT I THE REVESTMENT PROVISION OF THE ACT
 Section 1(b) of the Act provides:
 
 9
 (b) Upon a determination by the Secretary of the Army, within two years from the date of enactment of this Act, filed among the appropriate land records of the Department of the Interior, that any of the lands described in this Act are not required for Big Ben Project purposes, title to such land shall be revested in the former owner.
 
 
 10
 The Tribe asserts that Section 1(b) requires that the Secretary of the Army make a detailed study, within two years of the enactment of Pub.L. 87-734, to determine whether lands were taken in excess of project purposes and to revest title to such lands in the Tribe. The Tribe further claims that since the Secretary has not made such a determination within two years, he remains under a continuing obligation to do so. The Tribe construes the two-year provision as merely a Congressional directive to the Secretary as to what constitutes a reasonable time for such action, and not as a limitation on his authority. Finally, the Tribe contends that the phrase "required for Project purposes" as used in 1(b) should be narrowly construed, thereby limiting the taking to land strictly necessary for the narrow purposes of construction, operation, and maintenance of the dam and reservoir.
 
 
 11
 The United States, however, contends that Section 1(b) authorizes the Secretary, in his discretion, to make revestments should he find that lands were taken in excess of project requirements. Moreover, the Government interprets the two-year provision of 1(b) as a limitation on the Secretary's duty and authority to revest land; thus, even if the Secretary wanted to revest land after the two-year period, such action would be an unconstitutional usurpation of Congressional authority.[3] The United States further contends that while hydroelectric power production may have been the primary purpose of the Big Bend Project, the project shared the same broad purposes as the Flood Control Act under which it was authorized.
 
 
 12
 In ascertaining the Congressional intent behind Section 1(b), the district court properly relied on the principles of statutory interpretation set forth in Mattz v. Arnett, 412 U.S. 481, 505, 93 S.Ct. 2245, 2258, 37 L.Ed.2d 92 (1973). The court examined the language of the act, the legislative history, and the surrounding circumstances. Nonetheless, the Tribe asserts that the district court erred in its evaluation of the Big Bend Act by failing to take into account the special situation of the Lower Brule Sioux Tribe. The Tribe claims that because the Government had previously taken valuable river bottom lands from the Lower Brule Sioux for a flood control project,[4] Congress intended to mitigate the effects of the Big Bend taking by affording special treatment to the Lower Brule Sioux in the Big Bend Act. We disagree.
 
 
 13
 When a statute affects Indian treaty rights, well-established rules of construction mandate that ambiguous expressions be resolved in favor of the Indians. Rosebud Sioux Tribe v. Kneip, 430 U.S. 584, 97 S.Ct. 1361, 51 L.Ed.2d 660 (1977); Bryan v. Itasca County, 426 U.S. 373, 96 S.Ct. 2102, 48 L.Ed.2d 710 (1976); Northern Cheyenne Tribe v. Hollowbreast, 425 U.S. 649, 96 S.Ct. 1793, 48 L.Ed.2d 274 (1976). However, as the district court correctly noted, an examination of the legislative history and circumstances surrounding the enactment of a statute may reveal Congressional intent and resolve the ambiguity, obviating resort to these rules.
 
 
 14
 On its face, Section 1(b) is not so clear as to render either party's interpretation unreasonable. However, an analysis of the legislative history of the Big Bend Act and the circumstances surrounding its enactment indicates that it is unlikely that Congress intended to require affirmative action by the Secretary. It appears that Congress intended to take only a minimal amount of land and did not contemplate that there would be excess land to be revested.
 
 
 15
 In a hearing before a Senate subcommittee, Colonel David G. Hammond, U.S. Army Corps of Engineers, was asked whether landowners might retain their land, leasing flowage easements to the Corps, while utilizing areas not inundated. Colonel Hammond testified that "under our current policy, our taking will include only a very narrow strip above the operating pool level ... [T]here will be very little, if any, land available for leasing back, because we do not expect to take any more than is required." Problems Arising From the Construction of the Big Bend Dam, South Dakota: Hearing before a Subcommittee on Public Works, United States Senate, 86th Cong., 1st Sess. 12-13 (Feb. 16, 1959).
 
 
 16
 Mr. Robert J. Andrews, Chief of the Corps of Engineers' Planning and Control Branch (responsible for supervision of the preparation of maps and planning reports delineating, describing and justifying lands to be acquired for reservoir projects) stated in his affidavit that the "Eisenhower policy," a policy of minimal land acquisition, was in effect at the time of the Big Bend taking.[5]
 
 
 17
 The Big Bend Act was closely patterned after the earlier Standing Rock Act, Pub.L. No. 85-915, 72 Stat. 1762 (1958), another of the seven statutes enacted by Congress to acquire Indian lands for the Missouri River Basin Project.[6] 107 Cong.Rec. 14,768 (1961).
 
 
 18
 On the same day that Congress passed the Big Bend Act, it also enacted a second statute (Pub.L. No. 87-735, 76 Stat. 704) in furtherance of the Big Bend Project, authorizing the taking of lands from the Crow Creek Indians. In both of these acts Congress included revestment provisions identical to Section 1(b) of the Big Bend Act. While this does not clarify the meaning of Section 1(b), it does render unreasonable the Tribe's contention that Congress intended special treatment for the Lower Brule Sioux in regard to revestment of land.
 
 
 19
 While it appears unlikely that Congress intended that the Secretary be under an affirmative obligation to undertake a detailed study to determine whether lands must be revested, we are mindful that doubtful expressions must be construed favorably to the Indians. Rosebud Sioux Tribe v. Kneip, supra, 430 U.S. at 590, 97 S.Ct. at 1365; Bryan v. Itasca County, supra, 426 U.S. at 392, 96 S.Ct. at 2112; Northern Cheyenne Tribe v. Hollowbreast, supra, 425 U.S. at 655 n. 7, 96 S.Ct. at 1797 n. 7. Nevertheless, even assuming that the Secretary was under an obligation to make a study, we agree with the District Court that the Master Plan (Design Memorandum No. MB-16B) satisfied such a requirement.
 
 
 20
 The Master Plan, filed in February of 1964, outlined the proposed uses of the taken land and detailed the improvements and development that would be necessary to provide for maximum public benefit from the taken land. Preparation of such a plan would necessarily entail a consideration of the amount of land needed for Project purposes. Mr. Arvid L. Thomsen, Chief of the Planning Division of the Corps of Engineers, stated in his affidavit that "[w]hen the Master Plan was made, there were no lands considered to be in excess of project needs." Our precedents hold that "Once the question of public purpose has been decided, the amount and character of land to be taken for a project and the need for a particular tract to complete the integrated plan rests in the discretion of the legislative branch." United States v. Mischke, 285 F.2d 628, 632 (8th Cir.1961) (quoting Berman v. Parker, 348 U.S. 26, 35-36, 75 S.Ct. 98, 103-104, 99 L.Ed. 27 (1954); see also, United States v. 255 Acres of Land, 553 F.2d 571 (8th Cir.1977); United States v. Willis, 211 F.2d 1 (8th Cir.1954). Allowing such discretion is particularly appropriate here, since it appears that the physical characteristics of the land and soil in the Big Bend Project area would not permit a determination to be made with exactitude. Mr. Wayne G. Dorough, Chief of the Corps of Engineers' Water Quality and Sediment Section, stated in his affidavit that
 
 
 21
 Lands at the Big Bend Project are highly susceptible to land slides and sloughing because of a high bentonite content in much of the land. When bentonite is lubricated by ground water it often results in sloughing and sliding of large parcels of land ... Due to indeterminate variables and changing conditions at the Big Bend Project, it is impossible to determine an ultimate erosion line.
 
 
 22
 Because we hold that the Master Plan satisfied the requirements of Section 1(b) and the Plan was, in fact, filed within two years of the Big Bend Act, we need not decide whether the two-year provision of Section 1(b) was intended as a limitation on the Secretary's duty and authority to revest land.
 
 
 23
 Alternatively, the Tribe contends that even if the Master Plan did constitute a determination that no excess lands were taken, that determination is subject to judicial review because Congress did not authorize the taking of land for park and recreational purposes. The Tribe asserts that the phrase "required for Big Bend Project purposes" should be construed as limiting the taking to only those lands absolutely necessary for the narrow purposes of construction, operation and maintenance of the dam. We disagree.
 
 
 24
 It is undisputed that once an authorized public use is shown, the amount of land taken in a condemnation proceeding is not reviewable by the courts. Mischke, supra. The Tribe concedes that the 1944 Flood Control Act authorizes the development of park and recreational facilities in conjunction with the development of flood-control projects, but asserts that because Congress did not specifically designate park and recreational uses of land as purposes of the Big Bend Act, the Secretary was without authority to take Indian lands for those purposes.
 
 
 25
 Although Congress clearly has the power to abrogate Indian treaty rights in order to take tribal lands by eminent domain, it must enact statutes expressly authorizing the taking of Indian lands. United States v. Winnebago Tribe, 542 F.2d 1002 (8th Cir.1976); United States v. White, 508 F.2d 453 (8th Cir.1974); United States v. 2,005 Acres of Land, 160 F.Supp. 193 (D.C.S.D.1958), vacated as moot 259 F.2d 271 (8th Cir.1958). However, nothing in these cases indicates that Congress must state in the taking statutes the specific purposes for which the land is to be used.
 
 
 26
 The Flood Control Act itself authorized the construction of the dam and reservoir projects of the Missouri River Basin Project and the taking of non-Indian lands for the Project. 107 Cong.Rec. 14,768 (1961) (comments of Mr. Saylor and Mr. Berry). The Big Bend Act was merely specific authorization to acquire Indian lands for the Project. Id.
 
 
 27
 Further, it is clear that Congress contemplated that the Flood Control Act authorized multiple uses of the land taken for the various dams constructed under the Missouri River Basin Project. When Pub.L. No. 85-915 (the taking act for the Oahe Dam and Reservoir Project) was before the House of Representatives, Mr. E.Y. Berry (member of the House Committee on Interior and Insular Affairs and sponsor of the Big Bend Act) commented on the history of the bill:
 
 
 28
 In the Flood Control Act of 1944, Congress provided for the construction of a series of large earthen dams to be constructed on the main stem of the Missouri River ... Power is constructed as a by-product of these mammoth dams, and some reclamation and recreation is also provided under the plans of development in the upper reaches of the Missouri River....
 
 
 29
 104 Cong.Rec. 15,018 (1958).
 
 
 30
 Accordingly, we find that the Master Plan, filed in February, 1964, constituted a good-faith determination by the Secretary of the Army that under the Big Bend Act, no lands were taken in excess of project purposes. For the reasons previously stated, we need not determine whether the two-year provision of Section 1(b) was intended as a limitation on the Secretary's duty or authority to revest land. In addition, we find that Congress clearly intended that the Big Bend Project encompass the multiple purposes of the Flood Control Act of 1944. Thus, park and recreational uses were authorized, and the Secretary's determination of the amount of land required for the project is not subject to review by this court.
 
 
 31
 For the foregoing reasons, the District Court's order of summary judgment for the defendants is affirmed as to Count I.
 
 COUNT II GRAZING RIGHTS GRANTED BY THE ACT
 Section 10 of the Big Bend Act provides:
 
 32
 Subject to the right of the United States to occupy, use, and control trust and restricted lands acquired by this Act and heretofore acquired in condemnation action civil numbered 335 for the construction, operation, and maintenance of the Big Bend Dam and Reservoir project ... the Lower Brule Sioux Tribe shall be permitted, after the Big Bend Dam gates are closed and the waters of the Missouri River impounded, to graze stock without charge on such of the land described in this section as lies between the level of the reservoir and the taking line described in section 16 of this Act and as the Secretary of the Army determines is not devoted to other beneficial uses and to lease such land for grazing purposes to members or nonmembers of the tribe on such terms and conditions as the Secretary of the Interior may prescribe ... (emphasis added).
 
 
 33
 We agree with the district court's finding that the meaning of Section 10 is clear on the face of the Act. The italicized language can only refer to the "trust and restricted lands acquired by this Act and heretofore acquired in condemnation action numbered 335," since that is the sole description of land contained in Section 10. Section 16 of the Act merely describes in greater detail the trust and restricted lands which were taken for the project and provides that such lands will be identified and delimited on a map. Thus, there is simply no ambiguity on the fact of the statute, as the Tribe contends. The Tribe's interpretation of Section 10 as granting grazing rights on all land acquired for the Big Bend Project disregards the clear language of the statute.
 
 
 34
 As the district court noted, the legislative history of Section 10 supports the clear meaning expressed on the face of the statute, and indicates that Congress carefully considered the language used in drafting the provision.[7]
 
 
 35
 Nonetheless, the Tribe argues that such a construction of Section 10 is absurd, because enforcement and administration of such limited grazing rights would be difficult. However, when legislative intent is clearly expressed, it is not the function of the courts to question the wisdom of Congressional policy, or the ease of its administration.
 
 
 36
 The Tribe's attempt to broaden the scope of the grant is without merit. Accordingly, the district court's order of summary judgment for the defendants is affirmed as to Count II.
 
 
 37
 The judgment of the district court is affirmed.
 
 
 
 *
 The HONORABLE PAUL A. MAGNUSON, District Judge, for the United States District Court for the District of Minnesota, sitting by designation
 
 
 [1]
 The Honorable Donald J. Porter, United States District Judge for the District of South Dakota
 The opinion of the district court is reported at 540 F.Supp. 292 (1982).
 
 
 [2]
 The Great Sioux Reservation was established by the Fort Laramie Treaties of 1851, 11 Stat. 749 (1851) and 1868, 15 Stat. 635 (1868). The United States promised that the Great Sioux Reservation would be "set apart for the absolute and undisturbed use and occupation of the Indians herein named." 15 Stat. 635 at Art. II
 
 
 [3]
 Congress is vested with power to regulate and dispose of territory and property belonging to the United States. U.S. Const. Art. IV, § 3, cl. 2. The United States Supreme Court has held that neither courts nor executive agencies may limit or contravene Congress' exercise of that power. United States v. California, 332 U.S. 19, 27, 67 S.Ct. 1658, 1662, 91 L.Ed. 1889 (1947)
 
 
 [4]
 By the Act of September 2, 1958, Pub.L. No. 85-923, 72 Stat. 1773 (1958), Congress authorized the taking of lands from the Lower Brule Sioux for construction of the Fort Randall Dam and Reservoir, also part of the Missouri River Basin Project
 
 
 [5]
 "Joint Policy for Land Acquisition on Reservoir Projects; Department of the Interior-Department of the Army," 19 Fed.Reg. 8,845 (1954). Mr. Andrews described this policy of "blocking out" to minor subdivision lines rather than to major sectional subdivision lines as much more conservative than previous acquisition policies
 
 
 [6]
 Congress enacted seven statutes authorizing the taking of Indian lands for construction of dams under the Missouri River Basin Project: Garrison Dam (Fort Berthold Tribe): Pub.L. No. 81-437, 63 Stat. 1026 (1949); Oahe Dam (Cheyenne River Tribe): Pub.L. No. 83-776, 68 Stat. 1191 (1954); (Standing Rock Sioux Tribe): Pub.L. No. 85-915, 72 Stat. 1762 (1958); Fort Randall Dam (Crow Creek Sioux): Pub.L. No. 85-916, 72 Stat. 1766 (1958); (Lower Brule Sioux): Pub.L. No. 85-923, 72 Stat. 1773 (1958); Big Bend Dam (Lower Brule Sioux): Pub.L. No. 87-734, 76 Stat. 698 (1962); (Crow Creek Sioux): Pub.L. No. 87-735, 76 Stat. 704 (1962)
 
 
 [7]
 When the Big Bend Act was originally introduced (H.R. 5144, 87th Cong., 1st Sess. (1961)), Section 10 did indeed contain language indicating that grazing rights were to be granted on all lands taken for the Big Bend Project. However, H.R.Rep. 852, 87th Cong., 1st Sess. 4 (1961) includes a letter from the Secretary of the Army, in which he expressed his opposition to the broad grant of grazing rights in H.R. 5144. The Secretary recommended that the bill be amended to state that "[T]he Lower Brule Sioux Tribe ... shall be permitted ... to graze stock on the land between the level of the reservoir and the taking line, as described in Section 16 of this Act ..." Id. at 33. The House Committee on Interior and Insular Affairs amended the Act, restricting the grant of grazing rights in the following manner:
 [T]he Lower Brule Sioux Tribe and the individual members thereof shall be permitted ... to graze stock without charge for a period of five years on such of the land described in this section as lies between the level of the Reservoir and the taking line described in Section 16 of this Act....
 H.R.Rep. No. 852, 87th Cong., 1st Sess. 4 (1961).