# United States Court of Appeals for the Federal Circuit

06-1072


BARRY LEBEAU, Individually and on behalf of all
other persons similarly situated,

Plaintiff-Appellee,

v.


UNITED STATES,

Defendant-Appellant.


Mark V. Meierhenry, Danforth & Meierhenry, LLP, of Sioux Falls, South Dakota, argued for plaintiff-appellee. Of counsel was John M. Grossenburg, Grossenburg Law Office, of Winner, South Dakota.

Elizabeth Ann Peterson, Attorney, Appellate Section, Environment & Natural Resources Division, United States Department of Justice, of Washington, DC, argued for defendant-appellant. With her on the brief was Sue Ellen Wooldridge, Assistant Attorney General.

Appealed from: United States District Court for the District of South Dakota

Judge Lawrence L. Piersol

# United States Court of Appeals for the Federal Circuit

06-1072

BARRY LEBEAU, Individually and on behalf
of all other persons similarly situated,

Plaintiff-Appellee,

v.

UNITED STATES,

Defendant-Appellant.

DECIDED:  January 24, 2007

Before LOURIE, SCHALL, and DYK, Circuit Judges.

SCHALL, Circuit Judge.

The United States appeals from the final judgment of the United States District Court for the District of South Dakota in LeBeau v. United States, 334 F. Supp. 2d 1200 (D.S.D. 2004) ("Barry LeBeau").  The district court granted summary judgment against the United States in favor of plaintiff Barry LeBeau and a class of similarly situated individuals (collectively "the LeBeau plaintiffs" or "plaintiffs").  The LeBeau plaintiffs sought money damages under the Little Tucker Act, 28 U.S.C. § 1364(a)(2), for the United States' alleged breach of trust, based on what they asserted was the Secretary of the Interior's unreasonable delay in distributing to them their share of the Mississippi

Sioux Tribes Judgment Fund ("Judgment Fund"). The district court determined that the Secretary of the Interior ("the Secretary") had breached his trust duties owed to the LeBeau plaintiffs. Consequently, the court awarded money damages to the plaintiffs in the total amount of $1,827,985.80 and entered judgment accordingly. We hold, however, that the district court erred in its determination that the LeBeau plaintiffs were entitled to money damages as a result of the Secretary's breach of trust. We therefore reverse the court's judgment in favor of the plaintiffs and remand the case to the district court for entry of judgment in favor of the United States.

BACKGROUND

I.

The LeBeau plaintiffs constitute a class of Sisseton-Wahpeton Sioux Tribe lineal descendants who were determined eligible, by applications filed on or before November 1, 1973, to share in the Judgment Fund. The Judgment Fund stems from the United States' breach of treaty obligations under the Treaty of Prairie du Chien, July 15, 1830, 7 Stat. 328, and under the Treaty of Traverse des Sioux, July 23, 1851, 10 Stat. 949 (collectively "the Treaties"). In the Treaties, the Sisseton-Wahpeton Sioux Tribe of the Mississippi and other Indian tribes agreed to cede their lands in exchange for the United States' commitment to make various payments to the tribes and to provide the tribes with other benefits. Subsequently, these tribes claimed that the United States had breached its obligations under the Treaties. In 1967, the Indian Claims Commission approved a settlement of the tribes' claims in the amount of nearly $6 million. The settlement was between the United States and three successors to the signatory Sisseton-Wahpeton Sioux Tribe of the Mississippi (the Devils Lake Sioux Tribe of North

Dakota, the Sisseton-Wahpeton Sioux Tribe of South Dakota, and the Assinoboine and Sioux Tribe of the Fort Peck Reservation in Montana) ("the Tribes"). <u>Sisseton and Wahpeton Bands v. United States</u>, 18 Ind. Cl. Comm. 477 (1967). In order to satisfy this judgment, in 1968 Congress appropriated $5,874,039.50 and deposited the money into an interest-bearing trust account in the U.S. Treasury. Act of June 19, 1968, ch. 2, Pub. L. No. 90-351, 82 Stat. 239.

In 1972, Congress enacted the Act of October 25, 1972 ("1972 Distribution Act" or "Act") establishing a formula for the distribution of the Judgment Fund. Under this formula, the lineal descendants of the original Sisseton-Wahpeton Tribe of the Mississippi who were not enrolled in any of the Tribes (the "lineal descendants") were allotted 25.0225% of the Judgment Fund.[1] Pub. L. No. 92-555, 86 Stat. 1168 (codified as amended at 25 U.S.C. § 1300d-22 (2000)). The 1972 Distribution Act specified that each of the Tribes should prepare membership rolls, subject to approval of the Secretary, and that the Secretary should prepare a roll of lineal descendants of the Sisseton-Wahpeton Mississippi Sioux Tribe who were not members of any of the Tribes and distribute funds on a per capita basis to individuals listed on this roll. In 1973, the Secretary issued regulations that established an application procedure for enrollment as a lineal descendant and set a deadline of November 1, 1973, for enrollment applications. 38 Fed. Reg. 13,737 (May 25, 1973) (codified at 25 C.F.R. § 41.1 (1973) and recodified at 25 C.F.R. § 61.4(s) (1995)).

---

[1] The 1972 Distribution Act specified that the Devils Lake Sioux Tribe was to receive 21.6892% of the Judgment Fund, the Sisseton-Wahpeton Sioux Tribe of South Dakota was to receive 42.9730%, and the Assiniboine and Sioux Tribe of the Fort Peck Reservation in Montana was to receive 10.3153%. Act of October 25, 1972, 86 Stat. at 1169.

By March of 1982, the Bureau of Indian Affairs ("BIA") had processed all lineal descendant applications and, based on initial eligibility determinations, had determined that there were approximately 1,900 eligible lineal descendants. At the same time, appeals were pending for 500 additional applicants. The Aberdeen Area Office of the BIA requested authority in both March and October of 1982 to make a partial distribution of $1,700 to each eligible lineal descendant, but the Secretary denied these requests. In 1987, the BIA, after resolving the 500 appeals, completed the roll of 1,969 eligible lineal descendants and scheduled payment for May 7, 1987. By this time, each of the Tribes had received payment of its share of the Judgment Fund.

Payment to the lineal descendants of their share of the Judgment Fund was blocked by legal action, however. On May 8, 1987, the Tribes succeeded in obtaining a preliminary injunction from the United States District Court for the District of Montana, enjoining the distribution based on the Tribes' action to eliminate the lineal descendants' share of the Judgment Fund. Sisseton-Wahpeton Sioux Tribe v. United States, 686 F. Supp. 831, 832 (D. Mont. 1988), aff'd 895 F.2d 588 (9th Cir. 1990). The May 8, 1987 preliminary injunction was vacated in September 1994, but the United States District Court for the District of South Dakota again enjoined distribution to the lineal descendants in January of 1995 when fourteen individuals claimed they had never been notified of the opportunity to apply for enrollment as lineal descendents. See Loudner v. United States, 905 F. Supp. 747 (D.S.D. 1995), rev'd 108 F.3d 896 (8th Cir. 1997).

In 1998, Congress amended the 1972 Distribution Act through its enactment of the Mississippi Sioux Tribes Judgment Fund Distribution Act of 1998 ("1998 Amendments"). The 1998 Amendments applied to any portion of the Judgment Fund

06-1072                                    4

not yet distributed. 35 U.S.C. § 1300d (2000). In the 1998 Amendments, Congress reallocated 28.3995% of the undistributed Judgment Fund for the benefit of the governing bodies of the Tribes, see 35 U.S.C. § 1300d-23, in an attempt "to ensure that the number of people enrolled as lineal descendants does not result in a per capita windfall of judgment funds being allocated to individuals, when those resources are needed to supply needed capital to assist reservation economies," S. Rep. No. 105-379, at 7 (1998). Congress's action had the effect, of course, of reducing the amount of undistributed funds in the Judgment Fund available for the lineal descendants. Subsequently, the Tribes were paid their additional allocation from the Judgment Fund, while each lineal descendant received his or her share of the funds remaining for the lineal descendants. Eventually, the LeBeau plaintiffs brought the instant action.

## II.

The LeBeau plaintiffs' breach-of-trust claim in the present case is identical to the breach-of-trust claim of two lineal descendants in the related Casimir LeBeau lawsuit. See LeBeau v. United States, 215 F. Supp. 2d 1046 (D.S.D. 2002) ("Casimir LeBeau II"); LeBeau v. United States, 171 F. Supp. 2d 1009 (D.S.D. 2001) ("Casimir LeBeau I"). Because the district court accepted the parties' stipulation that the record in the Casimir LeBeau case can be incorporated into the record of the present case, it is instructive to discuss briefly the underlying Casimir LeBeau litigation.

## A.

On May 25, 1999, two individuals enrolled as lineal descendants (collectively "Casimir LeBeau") filed suit challenging the constitutionality of the 1998 Amendments and seeking damages based upon a Fifth Amendment takings claim and for a breach of

trust based on the enactment of the 1998 Amendments and the Secretary's delay in distributing the lineal descendants' share of the Judgment Fund. Casimir LeBeau I, 171 F. Supp. 2d at 1013, 1015. The district court dismissed the takings claim on summary judgment, finding that "the lineal descendants did not obtain vested property rights in the Judgment Fund because Congress retained the power to alter the allocation plan until the funds were distributed." Id. at 1024. The district court also dismissed on summary judgment Casimir LeBeau's breach-of-trust claim based upon the enactment of the 1998 Amendments, finding that the plaintiffs failed to identify a source of substantive law that could be interpreted as mandating compensation for the breach-of-trust claim. Id. at 1027. The district court reserved for trial, however, Casimir LeBeau's breach-of-trust claim based upon the Secretary's delayed distribution of the lineal descendants' share of the Judgment Fund. Id. at 1031.

After trial, the district court held that the Secretary's unreasonable delay in distributing the lineal descendants' share of the Judgment Fund constituted a breach of trust and awarded Casimir LeBeau damages under the Little Tucker Act. Casimir LeBeau II, 215 F. Supp. 2d at 1062-63. As an initial matter, the district court determined that the six-year statute of limitations did not bar the breach-of-trust claim because the cause of action did not accrue until the plaintiffs first suffered a financial injury in 1998 with the enactment of the 1998 Amendments. Id. at 1058-59. With regard to the merits of the breach-of-trust claim, the district court determined that the Secretary's unreasonable delay with respect to (i) the preparation of the partial distribution of the lineal descendants' share of the Judgment Fund requested in 1982 and (ii) the preparation of the roll and distribution of the lineal descendants' share of the Judgment

Fund prior to the 1987 preliminary injunction constituted a breach of trust. Id. at 1062. The district court therefore awarded damages in the amount that the individual lineal descendant shares in 1982, at the time of the proposed partial distribution, were decreased pursuant to the 1998 Amendments. Id. at 1062-63. The government's appeal of the judgment of the district court in Casimir LeBeau II was dismissed on motion per agreement of the parties.

B.

On August 6, 2002, Barry LeBeau filed a breach-of-trust claim for money damages under the Little Tucker Act based upon the Secretary's delay in distributing the lineal descendants' share of the Judgment Fund.[2] Barry LeBeau, 334 F. Supp. 2d at 1201. The district court certified the action as a class action, defining the class as

---

[2]    The Little Tucker Act provides in relevant part:
(a) The district courts shall have original jurisdiction, concurrent with the United States Court of Federal Claims, of:

. . . .

(2) Any other civil action or claim against the United States, not exceeding $10,000 in amount, founded either upon the Constitution, or any Act of Congress, or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort . . . .

28 U.S.C. § 1346(a)(2).
The Little Tucker Act grants jurisdiction, concurrent with the United States Court of Federal Claims, to federal district courts for the same types of claims allowed by the Tucker Act that do not exceed $10,000. The Little Tucker Act itself does not create a substantive right for money damages against the United States. See United States v. Mitchell, 463 U.S. 206, 216 (1983) ("Mitchell II"). Plaintiffs must identify a substantive right in some other source of law, such as "the Constitution, or any Act of Congress, or any regulation of an executive department," 28 U.S.C. § 1346(a)(2), that "can be fairly interpreted as mandating compensation by the Federal Government for the damage sustained," Mitchell II, 463 U.S. at 217. In this case, the district court had jurisdiction under the Little Tucker Act over each of the LeBeau plaintiffs' individual claims for money damages, which did not exceed $10,000, as a result of the Secretary's alleged breach of the trust arising under the 1972 Distribution Act. Barry LeBeau, 334 F. Supp. 2d at 1201.

"[a]ll Sisseton and Wahpeton Sioux Tribe lineal descendants who were determined to be eligible, by application filed on or before November 1, 1973, to share in the judgment fund . . . to be distributed pursuant to [the 1972 Distribution Act]." Id. at 1202. In due course, the parties cross-moved for summary judgment. Id. at 1201.

On August 18, 2004, the district court granted the LeBeau plaintiffs' motion for summary judgment and denied the government's cross-motion. Id. In granting the LeBeau plaintiffs' motion, the district court concluded that the 1972 Distribution Act "establishes fiduciary obligations of the Government in preparing the roll of lineal descendants and distributing the funds" and that it "can fairly be interpreted as mandating compensation by the Federal Government for damages sustained." Id. at 1204 (citation omitted). The district court relied on its reasoning in the Casimir LeBeau litigation, finding that the government had breached trust duties owed to the LeBeau plaintiffs by (i) unreasonably delaying the requested 1982 partial distribution and (ii) unreasonably delaying the preparation of the roll and the distribution of the lineal descendants' share of the Judgment Fund prior to the 1987 injunction. Id. Additionally, the district court stated that it found no persuasive reason to alter its earlier Casimir LeBeau decision that the breach-of-trust claims were not barred by the six-year statute of limitations. Id. As in Casimir LeBeau, the district court in the present case found that the appropriate measure of damages was based upon the partial distribution the LeBeau plaintiffs would have received if the requested partial distribution had been made. Id. at 1205. On May 6, 2005, the district court entered judgment in favor of the LeBeau plaintiffs, awarding each class member damages in the amount of $919.51, for a combined total award against the United States of $1,827,985.80.

After judgment was entered, the government filed a timely notice of appeal. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(2).

DISCUSSION

I.

Our task is "to determine whether [the lower court's decision] is premised on errors of law or clearly erroneous factual findings."[3] Hendler v. United States, 175 F.3d 1374, 1378 (Fed. Cir. 1999). This standard gives "considerable deference" to the lower courts factual findings, but conclusions of law are "subject to full and independent review." Id. (citing Gardner v. TEC Sys. Inc., 725 F.2d 1338, 1344 (Fed. Cir. 1984)). In any event, in this case the pertinent facts are not in dispute.

"Jurisdiction over any suit against the Government requires a clear statement from the United States waiving sovereign immunity, together with a claim falling within the terms of the waiver. The terms of consent to be sued may not be inferred, but must be 'unequivocally expressed.'" United States v. White Mountain Apache Tribe, 537 U.S. 465, 472 (2002) (quoting United States v. Mitchell, 445 U.S. 535, 538 (1980) ("Mitchell I")). A statute creates a right capable of grounding a claim for damages within the waiver of sovereign immunity if the statute "can be fairly interpreted as mandating compensation by the Federal Government for the damage sustained." Id. (quoting United States v. Mitchell, 463 U.S. 206, 217 (1983) ("Mitchell II")).

Consequently, in order to properly raise a breach-of-trust claim for damages against the United States, a plaintiff must "identify a substantive source of law that

---

[3] Although our review of a grant of summary judgment is usually "de novo," the standard of review differs in this case because the district court in the present case adopted and relied on findings of fact from the earlier Casimir LeBeau litigation.

establishes specific fiduciary or other duties, and allege that the Government failed faithfully to perform those duties." United States v. Navajo Nation, 537 U.S. 488, 506 (2002). Once a plaintiff identifies a source of law and alleges the government's failure, the court must determine "whether the relevant source of law 'can be fairly interpreted as mandating compensation for damages sustained as a result of a breach of the duties [the governing law] impose[s].'" Id. (quoting Mitchell II, 463 U.S. at 219).

III.

A.

The district court in Casimir LeBeau I determined that the 1972 Distribution Act imposed "fiduciary obligations on the Secretary because the United States retains control over tribal monies while the Secretary is preparing the roll." 171 F. Supp. 2d at 1028. For their part, the parties do not dispute that the 1972 Distribution Act imposed trust responsibilities and can be fairly interpreted under White Mountain and Mitchell II as mandating compensation for damages sustained as a result of a breach of those duties. Instead, the parties contest which version of the Distribution Act—the 1972 version as enacted or the 1998 version as amended—governs the substantive rights of the lineal descendants.

The LeBeau plaintiffs argue that the 1972 Distribution Act created a trust responsibility requiring the Secretary to prepare the roll of lineal descendants and to distribute to the lineal descendants their share of the Judgment Fund in a timely manner. The plaintiffs contend that the government breached this trust responsibility by unreasonably delaying the partial distribution in 1982 and the full distribution in 1987 and that the government's breach had the effect of leaving a corpus of money in the

Judgment Fund, which Congress was able to reallocate through the 1998 Amendments. According to the LeBeau plaintiffs, if the Secretary had timely distributed the Judgment Fund, this corpus of money would not have remained in existence in 1998, the result being that there would have been no way for Congress to reduce the share of the fund allocated to the lineal descendants by the original terms of the 1972 Distribution Act. The LeBeau plaintiffs do not challenge the proposition that Congress had the authority to reallocate the Judgment Fund. Instead, they maintain that Congress's amendment of the 1972 Distribution Act cannot cancel the government's liability for the delayed distribution of the Judgment Fund.

The government, both in briefing and at oral argument, has conceded that the 1972 Distribution Act created a trust responsibility that was breached by the Secretary's unreasonable delay in distributing the Judgment Fund. The government, however, argues that the 1972 Distribution Act, as amended by the 1998 Amendments, should govern the substantive rights of the lineal descendants. The government therefore reasons that no breach occurred because the Secretary, under the 1998 Amendments, had no duty to distribute the disputed 28.3995%[4] of the Judgment Fund to the lineal descendants. Additionally, the government contends that no causal link existed between the Secretary's decisions regarding the distribution of the Judgment Fund and Congress's action to amend the 1972 Distribution Act.

---

[4] As noted above, this is the percentage of the money remaining in the Judgment Fund in 1998, which Congress directed in the 1998 Amendments be allocated to the Tribes.

B.

We agree with the LeBeau plaintiffs that the 1972 Distribution Act created a trust responsibility between the United States and the lineal descendants and that the 1972 Distribution Act governed the government's obligations until Congress amended the Act in 1998.[5] We also agree that, as conceded by the government, the Secretary breached this trust responsibility by unreasonably delaying in the partial distribution in 1982 and in the full distribution in 1987 to the lineal descendants of their share of the Judgment Fund. We hold, however, that the LeBeau plaintiffs are not entitled to a recovery of damages for this breach because Congress, acting within its proper authority before any

---

[5] The terms of the 1972 Distribution Act created a trust responsibility because the United States retained control over tribal monies while the Tribes were preparing their rolls subject to the Secretary's approval, and while the Secretary was preparing the roll of lineal descendants. See Mitchell II, 463 U.S. at 225 ("'[Where] the Federal Government takes on or has control or supervision over tribal monies or properties, the fiduciary relationship normally exists with respect to such monies or properties (unless Congress has provided otherwise) even though nothing is said expressly in the authorizing or underlying statute (or other fundamental document) about a trust fund, or a trust, or fiduciary connection.'") (quoting Navajo Tribe of Indians v. United States, 224 Ct. Cl. 171, 183 (1980)). Section 202 of the Act provided in relevant part:

> (b) The shares of [the Tribes], as apportioned in accordance with subsection (a), shall be placed on deposit in the United States Treasury to the credit of the respective groups. Seventy per centum of such funds shall be distributed per capita to their tribal members: *Provided*, That none of the funds may be paid per capita to any person whose name does not appear on the rolls prepared pursuant to section 201(a) of this Act. The remainder of such funds may be advanced, deposited, expended, invested or reinvested for any purpose designated by the respective tribal governing bodies and approved by the Secretary of the Interior . . . .
> (c) The funds allocated to all other Sisseton and Wahpeton Sioux, as provided in subsection (a), shall be distributed per capita to the persons enrolled on the roll prepared by the Secretary pursuant to section 201(b) of this Act.

86 Stat. at 1169 (alteration in original).

distribution to the lineal descendants occurred, reallocated the lineal descendants' share of the Judgment Fund.

C.

Critical to our resolution of this case is a determination of what rights the 1972 Distribution Act created for the lineal descendants. Under the 1972 Distribution Act, each lineal descendant had the right to a timely distribution of his or her per capita share of the lineal descendants' portion of the Judgment Fund. Until the distribution to the lineal descendants occurred, however, Congress had the authority to alter the lineal descendants' portion of the Judgment Fund, thereby reducing the sum of money that each lineal descendant would receive. See, e.g., Del. Tribal Bus. Comm. v. Weeks, 430 U.S. 73, 90 (1977) ("The distribution . . . has not yet occurred, and Congress has the power to revise its original allocation); N. Cheyenne Tribe v. Hollowbreast, 425 U.S. 649, 653-56 (1976) ("The Court has consistently recognized the wideranging congressional power to alter allotment plans until those plans are executed."); United States v. Jim, 409 U.S. 80, 82-83 (1972) ("[I]t was well within the power of Congress to alter that distributional scheme."); Gritts v. Fisher, 224 U.S. 640, 648 (1912) ("[The allotment and distribution of tribal lands and funds were] but an exertion of the administrative control of the government over the tribal property of tribal Indians, and was subject to change by Congress at any time before it was carried into effect and while the tribal relations continued.").

In the circumstances of this case, where Congress did act to reallocate the lineal descendants' share of the Judgment Fund, the lineal descendants' recovery of damages for a breach-of-trust claim based on the Secretary's delayed distribution

depends upon the lineal descendants having vested rights in the Judgment Fund. If the lineal descendants' rights in the Judgment Fund had vested (that is, the lineal descendants had already received their distribution), Congress could not have deprived them of their share of the Judgment Fund without damages consequences under either a breach-of-trust claim or a takings claim. See Gritts, 224 U.S. at 647-48 (approving a Congressional enlargement of the pool of beneficiaries who were to benefit from a distribution of tribal property despite an earlier statute that had established a more limited pool); id. at 648 ("But that [allotment and distribution act] did not confer upon [the beneficiaries] any vested right such as would disable Congress from thereafter making provision for admitting newly-born members of the tribe to the allotment and distribution."). In this case, although each lineal descendant did have a right to a timely distribution of his or her per capita share of the Judgment Fund, the lineal descendants did not have vested rights in the Judgment Fund. See United States v. Rowell, 243 U.S. 464, 468-71 (1917) ("[S]tatutes of this type are not to be regarded as proposals by the government to enter into executory contracts, but as laws which are amendable and repealable at the will of Congress, save that rights created by carrying them into effect cannot be devested or impaired."); Gritts, 224 U.S. at 648. The lineal descendants' right to their per capita share of the Judgment Fund was always subject to modification by Congress until distribution of their share occurred, which would vest the lineal descendants' rights in the Judgment Fund. Since no action occurred that had the effect of vesting the lineal descendants' share of the Judgment Fund as set forth in the 1972 Distribution Act, the lineal descendants are not entitled to recover damages for a reduction in their share of the Judgment Fund.

In sum, Congress's reallocation of the lineal descendants' share of the Judgment Fund extinguished the government's liability for a breach by the Secretary because the lineal descendants never acquired vested rights in their share of the Judgment Fund as set forth in the 1972 Distribution Act.[6]  To permit recovery for a breach-of-trust claim in a case such as this, in which Congress acted to change the allotment for the lineal descendants prior to any distribution, would defeat Congressional intent.  The legislative history of the 1998 Amendments indicates that Congress enacted the new distribution formula "in order to correct its earlier error in allocating an excessive amount of the judgment fund to lineal descendants."  S. Rep. No. 105-379, at 8.

## CONCLUSION

For the foregoing reasons, the judgment of the district court in favor of the LeBeau plaintiffs is reversed.  The case is remanded to the district court for entry of judgment in favor of the United States.

## COSTS

Each party shall bear its own costs.

## REVERSED and REMANDED

---

[6]  We recognize that requiring the LeBeau plaintiffs to have vested rights in the Judgment Fund in order to recover damages for a breach-of-trust claim could be viewed as contradictory to the common law of trusts.  According to Bogert's The Law of Trust & Trustees § 871 (rev. 2d ed. 2005), "[a]ny beneficiary who can prove that the threatened or actual wrongdoing may or has affected him adversely financially may bring an action for relief.  It is not necessary that his interest be vested."  Although the common law of trusts does not require a beneficiary to have a vested interest in order to bring a breach-of-trust claim, in the special circumstances of the present case, the LeBeau plaintiffs must have had vested rights in the Judgment Fund in order to recover damages given that Congress acted to reallocate their share.