**Casimir LEBEAU and Vernon Ashley, Plaintiffs,**

v.

**UNITED STATES of America, Defendant.**

**No. CIV. 99–4106.**

United States District Court,
D. South Dakota,
Southern Division.

July 29, 2002.

John M. Grossenburg, Winner, SD, for plaintiffs.

Jan L. Holmgren, United States Attorney's Office, Sioux Falls, SD, for defendant.

## MEMORANDUM OPINION AND ORDER

PIERSOL, Chief Judge.

A trial by the Court was held on March 6, 2002. The Court previously granted partial summary judgment in favor of defendant on plaintiffs challenge to the constitutionality of the Mississippi Sioux Tribes Judgment Fund Distribution Act of 1998 ("the 1998 Act"). Pub.L. No. 105–387, 112 Stat. 3471 (codified at 25 U.S.C. § 1300d–21 et seq.).[1] The claim remaining for trial was plaintiffs' breach-of-trust claim for delay, pursuant to the "Little" Tucker Act, 28 U.S.C. § 1346(a)(2).

## BACKGROUND

The claim remaining for trial in this action is plaintiffs' claim that the United States breached its duties as trustee of a judgment fund by unreasonably delaying distribution of the fund, causing plaintiffs financial injury on November 13, 1998, when Congress enacted the 1998 Act. The fund was appropriated in 1968, Pub.L. No. 90–352, 82 Stat. 239, and in 1972 Congress allocated 25.0225% of the fund for distribution to Sisseton and Wahpeton Mississippi Sioux Tribe lineal descendants who were not members of certain listed tribes. See Pub.L. No. 92–555, 86 Stat. 1168 (codified at 25 U.S.C. § 1300d, et seq. (1983) (amended 1998)). For ease of reference, the Court will refer to this fund as "the Judgment Fund." The 1998 Act diminished, by at least 28.3995%, the lineal descendants' share of the Judgment fund, which plaintiffs are entitled to share in.

The Court denied defendant's motion for summary judgment on plaintiffs' breach-of-trust claim for delay in preparing the roll of lineal descendants and distributing the Judgment Fund as required by 25 U.S.C. §§ 1300d–3(b) and 1300d–4(c) (1983) (amended 1998). See LeBeau v. United States, 171 F.Supp.2d 1009, 1031 (D.S.D.2001). The statutory duty to prepare the roll of lineal descendants and distribute the Judgment Fund imposed by 25 U.S.C. §§ 1300d–3(b) and 1300d–4(c) (1983) (amended 1998)[2] at issue in this lawsuit has been referred to and will be

---

1. A detailed explanation of the plaintiffs' claims and of the 1998 Act is contained in the Court's prior opinions in this case. See Le-Beau v. United States, 171 F.Supp.2d 1009 (D.S.D.2001); LeBeau v. United States, 115 F.Supp.2d 1172 (D.S.D.2000).

2. The Secretary's duty to prepare the roll of lineal descendants is imposed under the 1972 Act by 28 U.S.C. § 1300d–3(b) (1983) (amended 1998):

   The Secretary of the Interior shall prepare a roll of lineal descendants of the Sisseton and Wahpeton Mississippi Sioux Tribe who were born on or prior to and are living on October 25, 1972, whose names or the name of a lineal ancestor appears on any available records and rolls acceptable to the Secretary, and who are not members of any of the organized groups listed in subsection (a) of this section. Applications for enrollment must be filed with the Area Director, Bureau of Indian Affairs, Aberdeen, South Dakota. The Secretary's determination on all applications for enrollment shall be final.

   The basis for apportionment and distribution under the 1972 Act were provided for in 28 U.S.C. § 1300d–4 (1983) (amended 1998):

   (a) **Basis of apportionment**

   After deducting the amount authorized in section 1300d of this title, the funds derived from the judgment awarded in Indian Claims Commission docket numbered 142 and the one-half remaining from the amount awarded in docket numbered 359, plus accrued interest, shall be apportioned on the basis of reservation residence and other residence shown on the 1909 McLaughlin annuity roll, as follows:

   | Tribe or group | Percentage |
   | --- | --- |
   | Devils Lake Sioux of North Dakota | 21.6892 |
   | Sisseton–Wahpeton Sioux of South Dakota | 42.9730 |
   | Assiniboine and Sioux Tribe of the Fort Peck Reservation, Montana | 10.3153 |
   | All other Sisseton and Wahpeton Sioux | 25.0225 |

referred to in this opinion as "the 1972 Act" to distinguish the 1972 statutes from the amended versions as a result of 1998 Act. In ruling on the pre-trial motions, the Court further held that genuine issues of material fact exist on the following issues: (1) whether the Secretary of the Interior ("Secretary") prepared the roll of lineal descendants, as required by 25 U.S.C. § 1300d–3(b) (1983) (amended 1998), and was prepared to distribute the lineal descendants' share of the Judgment Fund in 1987; (2) whether plaintiffs knew or should have known that they had a claim for breach of trust for delay in preparing the roll and distributing the Judgment Fund at any time prior to May 1993 (six years prior to the filing of the complaint in this action); and (3) if either of plaintiffs' breach-of-trust claims for delay are not barred by the statute of limitations, whether the United States breached trust duties owed to plaintiffs in the preparation of the roll and distribution of the Judgment Fund required by 25 U.S.C. §§ 1300d–3(b) and 1300d–4(c) (1983) (amended 1998). *See LeBeau*, 171 F.Supp.2d at 1031. The basis for this Court's jurisdiction is the "Little" Tucker Act, 28 U.S.C. § 1346(a)(2) (1993), under which this Court has jurisdiction for claims not exceeding $10,000 in civil actions founded upon any Act of Congress or any regulation of an executive department.

The witnesses that testified at the trial were Casimir LeBeau, Vernon Ashley, Karen Joseph and Earl Azure. The deposition of Cora Jones was also made a part of the record (Doc. 117). Casimir LeBeau and Vernon Ashley are the plaintiffs in this action and were notified in 1979 that they were eligible to share in the lineal descendants' portion of the Judgment Fund. Earl Azure is currently employed by the Bureau of Indian Affairs ("BIA") as a Tribal Government Officer in the Aberdeen Area Office. He has worked for the BIA since 1974 and has been involved in the preparation of rolls and distributions of approximately 30 separate funds similar to the Judgment Fund at issue in this lawsuit. Karen Joseph is employed as a Tribal Enrollment Specialist with the BIA in the Aberdeen Area Office. She has been employed with the BIA and has worked on several judgment funds since 1973. Joseph is the primary BIA employee that has been working on the preparation of the roll at issue in this action following the decision in *Loudner v. United States*, 108 F.3d 896 (8th Cir.1997).[3]

**(b) Deposit in United States Treasury; per capita shares; advances, deposits, expenditures, investments or reinvestments for approved purposes; programming proposals**
The shares of the Devils Lake Sioux Tribe of North Dakota, the Sisseton and Wahpeton Sioux Tribe of South Dakota, and the Assiniboine and Sioux Tribe of the Fort Peck Indian Reservation, Montana, as apportioned in accordance with subsection (a) of this section, shall be placed on deposit in the United States Treasury to the credit of the respective groups. Seventy per centum of such funds shall be distributed per capita to their tribal members: *Provided,* That none of the funds may be paid per capita to any person whose name does not appear on the rolls prepared pursuant to section 1300d–3(a) of this title. The remainder of such funds may be advanced, deposited, expended, invested, or reinvested for any purpose designated by the respective tribal governing bodies and approved by the Secretary of the Interior. . . .
**(c) Per capita distribution to enrollees**
The funds allocated to all other Sisseton and Wahpeton Sioux, as provided in subsection (a) of this section, shall be distributed per capita to the persons enrolled on the roll prepared by the Secretary pursuant to section 1300d–3(b) of this title.

3. The plaintiffs in the *Loudner* action are individuals claiming to be lineal descendants eligible to share in the Judgment Fund that did not receive notice of the existence of the Judgment Fund until 1994. The *Loudner* plaintiffs did not submit applications to share in the Judgment Fund before the expiration of the first deadline in November 1973. The Eighth

On March 8, 1982, the Aberdeen Area Office sent a request to the Deputy Assistant Secretary—Indian Affairs for permission to make a partial payment of approximately $1,700 to approximately 1,900 lineal descendants that had been determined to be eligible as of 1982. (Plaintiffs' Exhibit 9.) The Judgment Fund was estimated to be worth $4,100,000 as of April 22, 1982. (*Id.*) In 1982, both LeBeau and Ashley had been approved and would have shared in the partial distribution. In calculating the amount of the partial payment in 1982, the Aberdeen Area Office reserved sufficient funds to account for 500 pending appeals by applicants that had been determined to be ineligible, but who disputed that decision. A second request to make a partial payment was sent on October 8, 1982. (Plaintiffs' Exhibit 10.) The Aberdeen Area Office's requests to make a partial distribution were not approved by the Secretary. There is evidence in the record to show that LeBeau and Ashley knew about the Aberdeen Area Office's request for partial payment and that the request was not approved. (*See* Defendant's Exhibits 5 and 6.)

By 1987, the Aberdeen Area Office had processed all of the applications and all of the appeals relating to the Judgment Fund. Joseph was in Albuquerque in 1987 at the BIA's data processing center conducting the final checks on the roll to prepare it for payment. Joseph was balancing the roll to ensure the proper amount was paid to each lineal descendant. While Joseph was in Albuquerque she received a telephone call from Azure informing her that an injunction had been filed to prohibit the distribution of the Judgment Fund and that she should return to South Dakota. The preliminary injunction to which Azure referred was filed by the United States District Court for the District of Montana on May 8, 1987, in an action filed by the Tribes[4] to eliminate the lineal descendants' share of the Judgment Fund. *See Sisseton–Wahpeton Sioux Tribe v. United States*, 686 F.Supp. 831, 832 (D.Mont.1988) (noting that "[o]n May 8, 1987, this court granted the Sioux Tribe's request for preliminary injunctive relief thereby enjoining the distribution of the fund to the lineal descendants in accordance with the directive of 25 U.S.C. § 1300d–3(b), which was scheduled to commence on May 7, 1987."). In compliance with the preliminary injunction issued in Montana, Joseph ceased her final preparations for payment and returned to Aberdeen. The lineal descendants' share of the Judgment Fund has not yet been distributed.

The preliminary injunction in the Montana litigation was vacated in September 1994. The BIA was again preparing for distribution to the lineal descendants in 1994 when this Court enjoined the BIA from distributing the Judgment Fund in the *Loudner* action on January 6, 1995. *See Loudner v. United States*, CIV 94–4294 (D.S.D.), Doc. 12. Between 1987 and 1994 the number of eligible lineal descendants increased from 1,969 to 1,988. The preliminary injunction in *Loudner* remains

Circuit held that the United States breached its duty as trustee to notify beneficiaries of the existence of the trust and further held the *Loudner* plaintiffs' claims were not barred by the statute of limitations. *See Loudner,* 108 F.3d at 903. The *Loudner* case is currently on remand to this Court and the BIA is processing all new applications to prepare a new roll of all eligible lineal descendants. *See Loudner v. United States,* CIV 94–4294 (D.S.D.).

4. The "Tribes" are the Sisseton–Wahpeton Sioux Tribe, the Spirit Lake Tribe and the Sisseton–Wahpeton Sioux Council of the Assiniboine and Sioux Tribes, who are the beneficiaries of the reallocation in the 1998 Act and who were the three tribes that initially shared in the Judgment Fund under the 1972 Act. *See* 25 U.S.C. § 1300d–23 (2001); and 25 U.S.C. § 1300d–4(a) (1983) (amended 1998).

in effect today, except that the Court recently granted the United States' request to modify the injunction to allow a partial distribution of the Judgment Fund to the 1,988 lineal descendants approved prior to 1994, which includes the plaintiffs in this action. *See Loudner v. U.S.*, 200 F.Supp.2d 1146 (D.S.D.2002).

Plaintiff Casimir LeBeau is 84 years old and is a member of the Cheyenne River Tribe. He was a career BIA employee and retired on June 11, 1981. He was employed in the Minneapolis area office of the BIA. At the time of his retirement, he was an assistant area director. LeBeau learned of the Judgment Fund through his employment with the BIA. He completed his application form and submitted it in 1973. During his employment, LeBeau worked on budget and land issues. He was aware that funding was a problem in the BIA during his employment and that there were staff shortages. He was also aware that the Tribes exerted political pressures on the BIA. LeBeau was involved in determining how the Judgment Fund would be divided before the 1972 Act was enacted. LeBeau was fielding calls from lineal descendants inquiring about the status of the Judgment Fund distribution until he retired in 1981.

LeBeau made several attempts to exert pressure on the BIA to distribute the Judgment Fund beginning as early as 1974, which was before he had received official notification in 1979 that he was an eligible lineal descendant. In approximately 1974, LeBeau was in Washington D.C. and he had a conversation with Rick Lavis, who was a deputy to the new assistant Secretary for Indian Affairs. Lavis informed LeBeau that he did not know of any reason why the Judgment Fund should not be paid soon. When LeBeau returned to Washington D.C. a few months later and attempted to follow-up with Lav-

is, he learned that Lavis left the BIA's employment.

While he was still employed with the BIA, LeBeau visited the Aberdeen Area Office and learned that the staff was working on preparing rolls for other judgment funds but was not working on the roll for the Judgment Fund at issue in this lawsuit. LeBeau spoke with the Sisseton area director at the time, Richard Drapeau, and offered to send some people from the Minneapolis Area Office to help with the preparation of the roll.

Sebastian LeBeau is LeBeau's younger brother, who also worked for the BIA and has taken an active role in attempting to encourage the BIA to distribute the Judgment Fund. Sebastian has made several inquiries, including telephone calls and letters, over the years in an attempt to learn the status of the expected distribution. When Sebastian made a contact and learned anything about the status of the payment, he informed LeBeau. If Sebastian obtained copies of any documents, including the documents from the Montana litigation, he usually sent copies to Le-Beau.

One document sent to LeBeau by Sebastian was a letter from the Office of Indian Services Director, Theodore Krenzke, to Senator Larry Pressler dated November 4, 1983, explaining that "[t]he Aberdeen Area staff has been directed to give priority to the completion of the review of some 24,-000 applications filed for enrollment to share in an award made to the Pembina Chippewas. As soon as the Pembina roll has been completed, the Aberdeen Area Director will restore the completion of the distribution of the Mississippi Sioux judgment funds to priority status. We are sorry our reply cannot be more favorable." (Defendant's Exhibit 5.) At the bottom of this letter is Sebastian's handwriting stating "[w]hy should the Tribes put pressure

on BIA? ? To pay out. It is the BIA's responsibility to pay this out—instead of stalling all the *time*." (*Id.*) LeBeau read this letter with Sebastian's handwriting on the bottom.

LeBeau was aware that the Tribes lobbied Congress in approximately 1985 to reallocate at least the interest on the lineal descendants' share of the Judgment Fund to the Tribes. Sebastian apparently contacted United States Senator John Melcher from Montana in 1986 inquiring about the status of the Judgment Fund. (*See* Defendant's Exhibit 3.) Senator Melcher responded to Sebastian on November 14, 1986 stating that he was pleased they were able to block the Tribes' attempts to obtain the lineal descendants' share of the Judgment Fund and that the "BIA should be making payments in four to six months." (*Id.*) LeBeau received a copy of Senator Melcher's response to Sebastian and he did not receive payment in four to six months as indicated in the November 14, 1986 letter.

In 1997, LeBeau contacted United States Senator Tom Daschle expressing opposition to the legislation that had been introduced to require the BIA to distribute the principal amount of the Judgment Fund to the lineal descendants and the accumulated interest to the Tribes. (Defendant's Exhibit 2.) Senator Daschle expressed support for the legislation as a compromise with the Tribes to allow the original principal to be distributed to the lineal descendants. (*Id.*)

Vernon Ashley is 86 years old and is a member of the Crow Creek Sioux Tribe. He, like LeBeau, was notified in 1979 that he is eligible to share in the Judgment Fund as a lineal descendant. From 1946 to 1954, Ashley was the Chairman of the Crow Creek Sioux Tribe. Ashley graduated from Dakota Wesleyan University in 1954 with a degree in business administration. He was employed by the BIA as a relocation officer from 1955 to 1965. From 1965 to 1972 Ashley served as the first coordinator for Indian Affairs for South Dakota, acting as a liaison between the State of South Dakota and all of the Indian Tribes in South Dakota. From his experience with the BIA, he is familiar with the chain of command within the BIA.

Sebastian kept Ashley informed about what he knew of the status of the roll at issue in this lawsuit. Ashley also learned from Sebastian about the Tribe's lobbying efforts in the mid–1980's to obtain the lineal descendants' share and of their lawsuit in Montana federal court. Ashley wrote several letters to various individuals seeking to exert political pressure on the BIA to distribute the Judgment Fund.

Ashley wrote a letter to the Aberdeen Area Director, Jerry Jaeger, on April 16, 1981 stating that "[c]onsiderable time has passed since the determination was made and it is imperative that payments be made in the near future." (Defendant's Exhibit 9.) A response to Ashley's April 16, 1981 letter was sent to Ashley on August 14, 1981 by Karen Joseph stating "[y]ou and your children have been determined to be of Sisseton–Wahpeton descent and that particular descendancy roll needs additional work before we can process a payment. We hope to complete this roll later in the calendar year. Meanwhile, we ask that you keep our office advised of any address changes. Your continued patience is appreciated." (Defendant's Exhibit 8.)

Another letter authored by Ashley was sent to Mr. Sid Mills, the Assistant to the Secretary of Indian Affairs, on August 30, 1983. (Defendant's Exhibit 13.) In that letter, Ashley stated he had been informed by Earl Azure that the Aberdeen Area Office was not doing any work on the roll because they were working on other rolls. (*Id.*) Ashley complains about the delays and requests that Mr. Mills investigate his

complaints and expedite payment of the Judgment Fund. (*Id.*)

Ashley contacted Senator Larry Pressler at some point before September 3, 1983 to request that Senator Pressler inquire of the BIA what the status was of the roll for the Judgment Fund. On September 23, 1983, Director Theodore Krenzke sent the same letter to Senator Pressler quoted above indicating that the Aberdeen Area Office had been directed to work on the roll for the Pembina Chippewas, involving 24,000 applications, rather than working on the Sisseton–Wahpeton roll. (Defendant's Exhibit 6.) Ashley contacted Senator Pressler again in 1986 and Senator Pressler wrote him a letter on April 7, 1986 stating, "[t]he Bureau of Indian Affairs area office in Aberdeen must check all tribal rolls to determine who actually is a lineal descendant. This is a very time consuming project and the Area office does not have the manpower to devote full attention to the project. Consequently, these funds are still accruing interest in an account." (Defendant's Exhibit 4.) In the same letter Senator Pressler informed Ashley that legislation had been introduced to redistribute the lineal descendants' share to the Tribes. (*Id.*)

In their post-trial brief, plaintiffs' primary argument is that the United States breached its fiduciary duties to them by failing to authorize the partial payment of the Judgment Fund requested by the Aberdeen Area Office in 1982. (*See* Plaintiffs' Exhibits 9 and 10.) Plaintiffs contend that they are entitled to damages in the amount of $482.79, with interest from and after January 1, 1983. They calculate this amount by starting with the partial distribution of $1,700 per lineal that the Aberdeen Area Office requested to distributed in 1982 and multiplying it by 28.3995%, which was the amount the lineal descendants' share is decreased pursuant to the 1998 Act, i.e., $1,700 × 28.3995% = $482.79.

Plaintiffs did not present any evidence at trial regarding the delay in preparing the roll and distributing the Judgment Fund following the Eighth Circuit's decision in *Loudner,* 108 F.3d at 896. Rather, plaintiffs appear to have abandoned any claim for delay post-*Loudner* by stating in their post-trial brief that "[s]ince **Loudner** was decided, March 13, 1997, giving the post-**Loudner** plaintiffs their rights in the fund, and the passage of the 1998 Distribution Act, there has been no or little delay in preparing the roll and distributing." (Plaintiffs' Post Trial Brief, Doc. 121.) Thus, the Court will not make any findings regarding whether defendant breached a fiduciary duty to the lineal descendants following the *Loudner* decision or in the processing of the post-*Loudner* applications.

## DECISION

### I. Statute of Limitations

In this trial to the Court, plaintiffs carry the burden of proving their claims by a preponderance of the evidence. The statute of limitations applicable to civil actions against the United States, 28 U.S.C. § 2401(a), provides that "every civil action commenced against the United States shall be barred unless the complaint is filed within six years after the right of action first accrues."

The United States is entitled to sovereign immunity from suits unless Congress consents to suit, and consequently:

[T]he terms of its consent define the extent of the court's jurisdiction. The applicable statute of limitations is a term of consent. The plaintiff's failure to sue within the period of limitations is not simply a waivable defense; it deprives

the court of jurisdiction to entertain the action . . . . .

Because 28 U.S.C. § 2401 is a condition of the waiver of sovereign immunity, courts are reluctant to interpret the statute of limitations in a manner that extends the waiver beyond that which Congress clearly intended.

*Sisseton–Wahpeton Sioux Tribe v. United States,* 895 F.2d 588, 592 (9th Cir.1990).

### A. Preparation of the Roll in 1987

Defendant has asserted throughout this litigation that the BIA had completed the roll of eligible lineal descendants and was prepared to distribute the Judgment Fund in 1987. Thus, the defendant maintains that the latest date plaintiffs' claim for breach of trust for delay accrued was 1987 and plaintiffs' action, filed in 1999, is barred by the six-year statute of limitations in 28 U.S.C. § 2401. In the summary judgment proceedings, the Court found there was a genuine issue of material fact on whether the BIA was prepared to distribute the Judgment Fund in 1987.

Based upon the testimony of Earl Azure and Karen Joseph, the Court finds that the Aberdeen Area Office of the BIA, which was directly responsible for the preparation of the roll at issue in this case, had completed the roll and was prepared to distribute the entire Judgment Fund to 1,969 lineal descendants, including the plaintiffs, in 1987. This number increased to 1,988 by 1994 when the BIA was again preparing to distribute the Judgment Fund and the BIA was again enjoined from distributing the Judgment Fund by the preliminary injunction imposed by this Court on January 6, 1995 in the *Loudner* case. *See Loudner,* CIV 94–4294 (D.S.D.), Doc. 12.

### B. Statute of Limitations—Plaintiffs' Knowledge

The evidence at trial establishes that LeBeau knew as early as 1981 that the

BIA employees in the Aberdeen Area Office were not working on the Sisseton–Wahpeton roll. During a visit to the Aberdeen Area Office before his retirement, LeBeau was informed by a BIA employee that they were not working on the roll and that they would start working on it again when they could. Thus, LeBeau knew as early as 1981 that the BIA was delaying the preparation of the roll, which was a prerequisite to distribution. In 1983, LeBeau received a copy of a November 4, 1983 letter sent to his brother, Sebastian, authored by Theodore Krenzke, the Director of the Office of Indian Services, addressed to Senator Pressler, which explicitly stated that the Aberdeen Area Office had been directed to work on the Pembina roll rather than the Sisseton–Wahpeton roll and apologizing that his response could not be more favorable. (Defendant's Exhibit 5.) The evidence at trial clearly establishes that by 1983 LeBeau knew that the BIA was delaying the preparation of the Sisseton–Wahpeton roll and that the lineal descendants could not expect a payment in the near future.

The documentary evidence in the record establishes that Ashley was better informed than LeBeau of the BIA's delay in preparing the Sisseton–Wahpeton roll. On August 14, 1981, Joseph informed Ashley that the Aberdeen Area Office hoped to complete the roll in 1981. (Defendant's Exhibit 8.) That, of course, did not happen. On August 30, 1983, in a letter to the Assistant to the Secretary of Indian Affairs, Ashley stated that Earl Azure informed him that the BIA was not doing any work on the Sisseton–Wahpeton roll because they were working on other rolls. (Defendant's Exhibit 13.) Moreover, Ashley received the letter from Theodore Krenzke to Senator Pressler, dated September 23, 1983, admitting that the Aberdeen Area Office was directed to work on the Pembina roll (involving 24,000 applica-

tions) rather than the Sisseton–Wahpeton roll. (Defendant's Exhibit 6.) Thus, it is clear from the record herein that Ashley knew, at the latest, by 1983 that the BIA was delaying the preparation of the Sisseton–Wahpeton roll and that the Judgment Fund would not be distributed to the lineal descendants in the near future.

### C. Statute of Limitations Does Not Bar Plaintiffs' Claims

Before the trial, the Court stated that plaintiffs' breach of trust claim for delay in preparing the roll and distributing the Judgment Fund must be analyzed as two different breaches for purposes of the statute of limitations. (Doc. 85, Sept. 25, 2001.) Upon further research and consideration, however, the Court finds for the reasons explained below, that plaintiffs' claim for breach of trust for money damages did not accrue until the enactment of the 1998 Act and, thus, there is no need to analyze plaintiffs' claim as two different breaches for purposes of the statute of limitations.

■ Plaintiffs assert that the statute of limitations does not bar their breach-of-trust claim because the breach for delay was continuing and the first time there was a repudiation of the trust was in 1998 when Congress enacted the 1998 Act. The argument is that the enactment of the 1998 Act was the first time the lineal descendants knew that the Government was not going to pay them so that was the repudiation that began the running of the statute of limitations for the breach of trust for not distributing $1,700 to each of the plaintiffs in 1982.

Defendant, however, argues that the issue of repudiation does not apply in this case because the plaintiffs are not seeking money from the trust corpus. (Ct.Tr. at 99–100.) Rather, they are seeking money damages aside from the trust corpus. Defendant contends that if the plaintiffs

wanted to achieve distribution of the Judgment Fund, they should have filed an action under 5 U.S.C. § 702 to compel the BIA to distribute the funds, rather than filing the present claim.

There is authority to support the defendant's argument that repudiation does not apply in the context of this case. *See Jones v. United States*, 9 Cl.Ct. 292, 295 (1985). The United States Claims Court held that the rule that the statute of limitations does not run against a beneficiary until the trust is repudiated and the trust relationship is terminated "is not applicable where the claim is for damages arising from misfeasance or nonfeasance by the trustee, rather than for recovery of the trust corpus." *Id.* The Court does not find it necessary to determine whether the issue of repudiation applies in this case, because the plaintiffs' argument that the trust was first repudiated by the enactment of the 1998 Act is meritless. The fundamental basis for the plaintiffs' breach-of-trust claim is that the Secretary breached fiduciary duties in failing to prepare the roll and distribute the Judgment Fund within a reasonable period of time. Thus, the Secretary is acting in the capacity as trustee of the Judgment Fund rather than Congress. The Secretary did not take any action regarding the enactment of the 1998 Act that could, as a matter of fact, be determined to amount to a repudiation. The Court previously held that Congress had the authority to reallocate the Judgment Fund and that the 1998 Act is constitutional. *See LeBeau*, 171 F.Supp.2d at 1031. Plaintiffs cite no authority and the Court has found none for the proposition that enactment of a constitutional act can amount to a repudiation as that term is used in the context of a breach of trust duties. Thus, the Court holds that the 1998 Act did not amount to a repudiation as that term is used in the context of a claim for breach of trust.

■ That the 1998 Act did not amount to a repudiation, however, does not control the issue before the Court. Rather than employing the repudiation rule, the Court finds that the beginning of the statute of limitations in this action was espoused by the Eighth Circuit in *Loudner:* "[t]he statute of limitations begins to run when a trust beneficiary knows or should know of the beneficiary's claim against the trustee. Nonetheless, because the beneficiary is entitled to rely upon the good faith and expertise of the trustee, the beneficiary's duty to discover claims against the trustee is somewhat lessened." 108 F.3d at 901. The United States Court of Appeals for the Federal Circuit explained that "[i]t is generally stated that a claim 'first accrues' when all the events have occurred which fix the alleged liability of the defendant and entitle the plaintiff to institute an action." *Hopland Band of Pomo Indians v. United States,* 855 F.2d 1573, 1578 (Fed. Cir.1988). The Federal Circuit was examining the accrual of a claim under 28 U.S.C. § 2501 (1982), which has the same accrual language as 28 U.S.C. § 2401, that the claim is barred unless the complaint is filed within six years after the right of action "first accrues." Expanding on the general rule, the Federal Circuit stated that "for purposes of section 2501, it would appear more accurate to state that a cause of action against the government 'first accrued' only when all the events which fix the government's alleged liability have occurred *and* the plaintiff was or should have been aware of their existence." *Hopland,* 855 F.2d at 1577.

In this case, both LeBeau and Ashley knew by 1983, at the latest, that the BIA was not working on the Sisseton–Wahpeton roll and there was no plan for completing the roll and distributing the Judgment Fund in the near future. That the BIA was stalling in preparing the roll and distributing the Judgment Fund, however, did not cause plaintiffs' financial injury in 1982 because the principal had not been reduced and interest was accruing on the entire fund. Thus, although plaintiffs were injured in the sense that the BIA was not distributing the Judgment Fund, their financial interests were protected so long as the trust corpus remained intact and interest was accruing on the fund. For the reasons explained below, the Court holds that plaintiffs' cause of action for breach of trust for money damages under the "Little" Tucker Act, 28 U.S.C. § 1346(a)(2), did not accrue until plaintiffs first suffered a financial loss, thus fixing the United States' liability for damages for breach of trust and entitling plaintiffs to institute this action.

In order to prevail on a claim for breach of trust for money damages, plaintiffs must prove they suffered a loss:

A beneficiary seeking to obtain relief for a breach of trust must plead and prove facts which show the existence of a fiduciary duty and the failure of the trustee to perform it, and that consequently the court should grant the requested remedy. If he seeks damages, a part of his burden will be proof that the breach caused him a loss.....

Any beneficiary who can prove that the threatened or actual wrongdoing may or has affected him adversely financially may bring an action for relief. It is not necessary that his interest be vested.

G. Bogert, *The Law of Trusts & Trustees* § 871, at 156 (rev.2d ed.1995). The Ninth Circuit Court of Appeals recognized this requirement: "[b]eneficiaries seeking damages for a breach of trust must not only show that a trust exists and has been breached but also that the breach caused the beneficiaries' injury." *Rogers v. United States,* 697 F.2d 886, 890 (9th Cir.1983). Not only is a financial loss or injury an element of the underlying claim for breach of trust in an action to recover money

damages, but plaintiffs can proceed against the United States under the "Little" Tucker Act only if their claim is one for money damages. *See* 28 U.S.C. § 1346(a)(2); *United States v. Mitchell,* 463 U.S. 206, 216, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983) (*Mitchell*) (explaining that "[n]ot every claim invoking the Constitution, a federal statute, or a regulation is cognizable under the Tucker Act. The claim must be one for money damages against the United States...."). Thus, plaintiffs could not state a breach-of-trust claim for money damages to provide this Court with jurisdiction under the "Little" Tucker Act until they suffered a financial loss or injury as a result of defendant's breach.

█ The Eighth Circuit explained the basis of this Court's jurisdiction under the "Little" Tucker Act in *Loudner,* on a claim for breach of the government's fiduciary duty as trustee:

> The basis of our jurisdiction is the "Little" Tucker Act, 28 U.S.C. § 1346(a)(2), under which the United States has waived sovereign immunity with respect to civil actions founded upon any Act of Congress or any regulation of an executive department. The jurisdiction of the district courts (as distinguished from the United States Court of Federal Claims) under this statute is limited to claims not exceeding $10,000.00....

*Loudner,* 108 F.3d at 900. The Tucker Act itself does not create a substantive right for money damages against the United States. *See Mitchell,* 463 U.S. at 216, 103 S.Ct. 2961. Rather, "[a] substantive right must be found in some other source of law, such as 'the Constitution, or any Act of Congress, or any regulation of an executive department.'" *Id.* (quoting 28 U.S.C. § 1491). The Eighth Circuit previously ruled that the government "had the obligation to act as a trustee in its management of the judgment fund, and we must judge its conduct 'by the most exact-

ing fiduciary standards.'" *Loudner,* 108 F.3d at 901 (quoting *Seminole Nation v. United States,* 316 U.S. 286, 297, 62 S.Ct. 1049, 86 L.Ed. 1480 (1942)). This Court previously ruled on the parties' pre-trial motions that the 1972 Act "clearly establishes fiduciary obligations of the government in preparing the roll of lineal descendants and distributing the funds," and that it "can 'fairly be interpreted as mandating compensation by the Federal Government for damages sustained.'" *See LeBeau,* 171 F.Supp.2d at 1029 (quoting *Mitchell,* 463 U.S. at 226, 103 S.Ct. 2961).

For purposes of the statute of limitations inquiry, the Court will assume plaintiffs can prove defendant violated its fiduciary duties by delaying the preparation of the roll and distributing the Judgment Fund and that this breach caused plaintiffs financial loss. Thus, the remaining question in determining when plaintiffs' claim accrued is when did plaintiffs first suffer a financial loss. Plaintiffs' allegation in this action is that the enactment of the 1998 Act was the first time they knew that the United States was not going to pay them the full amount of the Judgment Fund allocated to them and the remaining lineal descendants under the 1972 Act. Upon enactment, the 1998 Act reallocated at least 28.3995% of the lineal descendants' share of the Judgment Fund from the lineal descendants to the Tribes. Thus, plaintiffs first suffered a financial loss from the Secretary's delay in preparing the roll and distributing the Judgment Fund when the 1998 Act was enacted. It is important to note that, in light of the Court's prior ruling that the 1998 Act does not violate plaintiffs' Fifth Amendment rights, plaintiffs are not asserting at this time that the enactment of the 1998 Act *itself* is a breach of trust. The present claim is not that Congress lacked authority to enact the 1998 Act; rather the claim is that Congress would not have reallocated the Judgment Fund if the Secretary had performed

his duty without excessive delay to prepare the roll and distribute the Judgment Fund.

■ Enactment of the 1998 Act was the first time the lineal descendants' share of the Judgment Fund was depleted as a result of the Secretary's delay in preparing the roll and distributing the funds. Therefore, the plaintiffs first had a claim for money damages, as a result of the Secretary's breach of trust, on November 13, 1998. *See* 25 U.S.C. § 1300d-21 *et seq.* (2001). Thus, the statute of limitations on plaintiffs' breach-of-trust claim for money damages giving this Court jurisdiction under the "Little" Tucker Act began to run on November 13, 1998, when all the events had occurred that fixed the alleged liability of the defendant and entitled the plaintiffs to institute an action, and plaintiffs knew or should have known that they had a claim for money damages against the defendant as trustee.[5] *See Hopland*, 855 F.2d at 1577.

This action was filed on May 27, 1999, well within the 6-year statute of limitations under 28 U.S.C. § 2401(a). Plaintiffs' breach-of-trust claim for money damages providing this Court with jurisdiction under the "Little" Tucker Act is not barred by the statute of limitations.

## II. Merits of Claim for Breach of Trust

The remaining issues before the Court are whether the United States breached trust duties owed to plaintiffs in the preparation of the roll and distribution of the Judgment Fund required by 25 U.S.C. §§ 1300d-3(b) and 1300d-4(c) (1983) (amended 1998); if there was a breach, whether plaintiffs suffered a financial loss and whether the breach caused plaintiffs' financial loss; if the breach caused financial loss what amount of damages are plaintiffs entitled to recover; and are plaintiffs entitled to recover interest as part of their damages.

■ The only beneficiaries under the 1972 Act that have not been paid are the lineal descendants. The three tribal beneficiaries under the 1972 Act received their shares before 1982. The Aberdeen Area Office twice requested to make a partial distribution to the lineal descendants in 1982, but those requests were not approved. One of the primary BIA employees assigned to work on the preparation of the roll for the Judgment Fund was Karen Joseph. During trial in response to plaintiffs' counsel's questions, Joseph testified as follows:

Q. Is it fair to say, Karen, that the only group that did not receive payment under the 1972 Distribution Act was the Sisseton–Wahpeton lineal descendants?

A. Yes.

Q. Do you know why they were the only group that hasn't been paid?

---

5. As an alternative basis for the holding, the Court holds that even though plaintiffs had personal knowledge that the BIA was delaying the preparation of the roll in 1983 by placing other rolls ahead of the Sisseton–Wahpeton roll, this knowledge did not put plaintiffs on notice that they had a claim for breach of trust. The point in time that a delay in distributing the funds becomes a breach of trust in the absence of a certain financial injury is not a clear starting point, and thus, the Court cannot hold that plaintiffs knew or should have known, on or before May 27, 1993 (six years before this action was filed) that they had a cause of action for breach of trust for delay. While plaintiffs could have filed an action under the Administrative Procedures Act, 5 U.S.C. § 702, it is not likely that plaintiffs could have obtained relief under § 702 after May 8, 1987, because of the preliminary injunctions in place. In light of the Court's holding that the statute of limitations did not accrue until November 13, 1998, the Court has not addressed the issue of equitable tolling if it had been determined that the plaintiffs' cause of action accrued before May 27, 1993.

A. Well, personally, I believe they just didn't have the Tribal support there. I mean they were lineal descendants of one of those beneficiary Tribes, and the pressure just wasn't there. And then we were, got hit with that other big Pembina judgment award, fifty-two million one that involved one of our Tribes, so that's where the attention was focused.

(Trial Transcript, p. 11.) This lack of political pressure from the Tribes to distribute the Judgment Fund was given as one of the reasons the BIA had not distributed the fund as of 1983 when Ted Krenzke wrote to Senator Pressler. (Defendant's Exhibits 5 and 6.)

While the Court recognizes that governmental agencies are not free from political pressure and are subject to budgetary restrictions, the BIA's lack of diligence in preparing the roll and distributing the Judgment Fund because of a lack of political pressure from any Tribe violated the defendant's duties to the lineal descendants as trustee of the fund. One of the fundamental obligations of a trustee required to distribute the trust property is to "proceed with expedition to wind up the trust and distribute the estate." Restatement, Second, Trusts, § 345, comment e. The sole purpose of the trust in the present case is to distribute the Judgment Fund to the lineal descendants. Thus, the defendant's duties as trustee are akin to a trustee's duty to wind up the trust and distribute the trust assets. "Determination of what constitutes a reasonable period within which to wind up the trust and distribute the trust assets will depend upon a number of facts with respect to the particular trust." G. Bogert, *The Law of Trusts & Trustees*, § 1010 at (FN 4) (rev.2d ed.1984).

A prerequisite to distribution in this case is the preparation of the roll of lineal descendants identifying the individual beneficiaries. The Court recognizes that the BIA was responsible for distributing a number of different judgment funds during the 1970's and 1980's. This responsibility, however, did not relieve the defendant of its obligations to act with diligence in the best interests of the beneficiaries of the Judgment Fund at issue in this lawsuit. That the lineal descendants did not have tribal representation to assert political pressure on the BIA to distribute the Judgment Fund likewise does not reduce or relieve the defendant's duties as trustee.

The original deadline to apply for a share in the Judgment Fund was November 1, 1973. *See Loudner*, 108 F.3d at 899. By 1979, the BIA had processed plaintiffs' applications and officially notified them they were eligible to share in the Judgment Fund. The record demonstrates that at least by March 1982, the Aberdeen Area Office had processed all timely-filed applications and made initial determinations of eligibility on those applications. In March 1982, the number of eligible lineal descendants was approximately 1,900, with an additional 500 applications that had been initially denied but were in the appeal process. (Plaintiffs' Exhibit 9.) The Aberdeen Area Office requested in March 1982 and again in October 1982 to make a partial distribution to the eligible lineal descendants. (Plaintiffs' Exhibits 9 and 10.) These requests were not approved.

The failure to approve a partial distribution was a breach of defendant's fiduciary duties. The duty in this situation is akin to a trustee's duty to make a distribution at the termination of a trust even though the trustee has not had the opportunity to make his final accounting:

*e. Delay in making conveyance.* Although the time for the termination of the trust has arrived, the trustee is not liable for breach of trust merely because

he does not immediately convey the trust property to the beneficiary entitled to it . . . . .

When the time for the termination of the trust has arrived it is the duty of the trustee to proceed with expedition to wind up the trust and distribute the estate. The trustee is entitled to take such time and such steps as are reasonably necessary for the protection of the interests of the beneficiary and for the trustee's own protection.

The trustee is not under a duty to make a distribution of the whole estate until he has had an opportunity to make an accounting and to obtain a decree of the court approving the distribution. It is the duty of the trustee, however, to make his final accounting with reasonable promptness.

The trustee is not necessarily justified, however, in withholding the whole of the trust estate from distribution until a final accounting. To the extent that a distribution of a part of the property can be made without risk to the beneficiaries or to the trustee, he should make such distribution. Thus, if it is clear that a certain beneficiary is entitled to receive a certain part of the trust estate, the trustee is not justified in withholding such part from distribution merely because the total amount which the beneficiary is to receive has not been ascertained . . . . .

Restatement (Second) of Trusts § 345, cmt. e (1959). The Aberdeen Area Office clearly informed the Deputy Assistant Secretary—Indian Affairs of the BIA that a distribution of a part of the Judgment Fund could be made without risk to the beneficiaries or to the trustee. It is clear that the 1,900 eligible beneficiaries, including the plaintiffs, were entitled to receive a certain part of the Judgment Fund, i.e. $1,700 each. Thus, the defendant was not justified in withholding that part from distribution merely because the total amount

each beneficiary was to receive had not been ascertained as of 1982. The only reason advanced in the documents and testimony presented at trial for the non-approval of the partial payment in 1982 was a lack of pressure from any tribe to make a partial payment. Lack of tribal pressure, however, is not a justification for withholding the partial distribution in 1982, considering that the United States' conduct as trustee must be judgment " 'by the most exacting fiduciary standards.' " *Loudner*, 108 F.3d at 901 (quoting *Seminole Nation*, 316 U.S. at 297, 62 S.Ct. 1049).

■ In addition to the breach for failure to make a partial distribution, defendant breached its obligation to distribute the Judgment Fund in total within a reasonable period. *See* G. Bogert, *The Law of Trusts & Trustees*, § 1010, at [FN 4]. The majority of the work to prepare the roll for distribution was completed by 1982, because at that time 1,900 lineal descendants had been found to be eligible and there were only 500 appeals to be resolved. Because the lineal descendants did not have tribal representation to assert pressure on the BIA to complete the roll, it took until 1987, another five years, to resolve those 500 appeals. Rather than resolving those 500 appeals to complete the roll and distribute the Judgment Fund, the Aberdeen Area Office was directed in 1982 or 1983, due to tribal political pressure, to work on the Pembina distribution involving approximately 24,000 initial applications. At some point between 1982 and 1987 the appeals were eventually resolved and there were 1,969 eligible lineal descendants as of 1987 when final preparations were being made to distribute the Judgment Fund. By the time the BIA was prepared to distribute the Judgment Fund, 15 years had elapsed since the 1972 Act was enacted and 13½ years had elapsed since the deadline to file applications expired.

After the non-approval of the 1982 requests to make a partial distribution and during the time when the 500 appeals were pending, the Tribes began lobbying Congress to reallocate the lineal descendants' share of the Judgment Fund to the Tribes. When the Tribes' lobbying efforts proved unsuccessful and on the eve of distribution, nearly 15 years after the Judgment Fund was allocated to the lineal descendants and the defendant's trustee duties began, the Tribes were successful in obtaining a preliminary injunction by the federal district court in the District of Montana. If the partial distribution had occurred in 1982 as requested by the Aberdeen Area Office or the Judgment Fund had been distributed in full prior to May 8, 1987, the plaintiffs would have received their share of the Judgment Fund. While plaintiffs continue to suffer harm from the breach of trust duty in the sense that they have not received their share of the Judgment Fund, their financial interests have been protected, at least until November 13, 1998, because their shares were accruing interest. On November 13, 1998, plaintiffs first suffered a financial loss from the defendant's breach of trust duties to diligently administer the trust and wind up the trust and distribute the Judgment Fund within a reasonable period of time.

A trustee is liable for a breach of trust for delay in distributing the trust property if the financial loss to the beneficiary occurred after the trustee unreasonably delayed distribution:

> f. *Liability for delay in selling or distributing property.* Where it is the duty of the trustee to convey trust property to the beneficiary in kind, and the property depreciates in value before the conveyance is made, the trustee is liable for the amount of such depreciation if, but only if, it occurred after the trustee had unreasonably delayed in making the conveyance. Similarly, if the trustee holds trust funds on deposit in a bank which it

is his duty to pay to the beneficiary, and the bank fails while the money is still on deposit, the trustee is liable for the loss if he had delayed for an unreasonable time in making payment to the beneficiary. Even if the bank does not fail, the trustee is liable for interest during the period of such unreasonable delay.

Restatement (Second) of Trusts § 345, cmt. f.

The Court holds that the defendant breached its trust duties by unreasonably delaying the partial distribution requested in 1982 and by unreasonably delaying the preparation of the roll and distributing the Judgment Fund prior to the issuance of the Montana court's preliminary injunction on May 8, 1987. From May 8, 1987 until September 1994, the Secretary of the BIA was enjoined from distributing the Judgment Fund by the Montana court's preliminary injunction. The preliminary injunction issued by this Court in *Loudner,* was then issued on January 6, 1995. Thus, there was a period of approximately three months in 1994 during which the Secretary was not enjoined from distributing the Judgment Fund. On this record, the Court does not hold the defendant responsible for the delay in distribution caused by the issuance of the preliminary injunctions discussed herein. The Court does, however, hold defendant liable for the delay in preparation of the roll and distribution between 1972 and 1987, from which plaintiffs first suffered a financial injury on November 13, 1998 upon the enactment of the 1998 Act.

■ The next issue is what amount of damages plaintiffs are entitled to recover. Plaintiffs contend that they are entitled to damages in the amount of $482.79, with interest from and after January 1, 1983. They calculate this amount by starting with the partial distribution of $1,700 per lineal descendant that the Aberdeen Area

Office requested to distributed in 1982 and multiplying it by 28.3995%, which is the amount the lineal descendants' share is decreased pursuant to the 1998 Act, i.e., $1,700 × 28.3995% = $482.79. Defendant contends that the partial distribution amount of $1,700 per lineal descendant cannot be used as a measurement of plaintiffs' damages because that amount was simply an estimate and it does not take into account the reduction in plaintiffs' share of the Judgment Fund as a result of the increase in the number of eligible lineal descendants pursuant to *Loudner*, 108 F.3d at 903.

The Court finds that the plaintiffs' estimate of damages is reasonable because the Aberdeen Area Office had expressly determined that a partial distribution of $1,700 to each of the 1,900 eligible lineal descendants in 1982, including plaintiffs, was an appropriate distribution. *See John Morrell & Co. v. Local Union 304A*, 913 F.2d 544, 557 (8th Cir.1990) (explaining that a plaintiff must prove his damages with "reasonable certainty"). Thus, each of the plaintiffs would have received $1,700. The financial injury suffered by plaintiffs as a result of the 1998 Act results in each plaintiffs' share being decreased by 28.3995 per cent, which calculates to $482.79 each.

█ The final issue to be addressed is whether plaintiffs are entitled to recover interest as part of their damages. The Supreme Court explained that "[i]n the absence of express congressional consent to the award of interest separate from a general waiver of immunity to suit, the United States is immune from an interest award." *Library of Congress v. Shaw*, 478 U.S. 310, 314, 106 S.Ct. 2957, 92 L.Ed.2d 250 (1986). The United States Claims Court explained that "despite the general waiver of sovereign immunity allowing suit, interest is *not* allowable in claims against the United States unless a Fifth Amendment taking has occurred, or unless

interest is provided for in an express contractual provision or by statute." *Short v. United States*, 25 Cl.Ct. 722, 724 (1992) (citing 25 U.S.C. § 2516(a) (1982)). In *Short*, the Claims Court held that the plaintiffs were entitled to an interest award because the funds at issue were held in trust by the government for the plaintiffs and were subject to the specific interest provisions in 25 U.S.C. §§ 161a and 161b (1982) and 25 U.S.C. § 161a (Supp. III 1985). 25 Cl.Ct. at 726–27. The Claims Court relied on the Supreme Court's holding in *Mitchell*, 463 U.S. at 211–28, 103 S.Ct. 2961, which affirmed the Court of Claims' decision, *Mitchell v. United States*, 229 Ct.Cl. 1, 664 F.2d 265 (1981), that the United States was liable for money damages, including interest, on funds collected and held in trust by the United States for breach of fiduciary duties. *See Short*, 25 Cl.Ct. at 727. The United States Court of Appeals for the Federal Circuit explained that if the government breaches its trust duties where the government has a statutory obligation to hold funds for certain Indians and is obligated to accrue interest on those amounts until distribution, the government "owes the plaintiffs interest, *not* as interest on their damages, but as part of the damage award itself." *Short v. United States*, 50 F.3d 994, 999 (Fed.Cir.1995).

Similar to the fund in *Short*, 25 Cl.Ct. at 727, the Judgment Fund at issue in this case is held in trust by the defendant and is subject to the specific interest provisions in 25 U.S.C. § 161a. *See Short*, 50 F.3d at 999. Thus, pursuant to *Short*, 25 Cl.Ct. at 727, *Short*, 50 F.3d at 999; and *Mitchell*, 229 Ct.Cl. at 16, 664 F.2d at 275, plaintiffs are entitled to interest as a part of their damages for breach of trust.

The Court is unable to calculate the amount of interest at this point, however, because the measure of plaintiffs' damages

based upon the requested partial distribution in 1982 contains an element of interest and plaintiffs' are not entitled to recover interest on that portion of the damages award. Allowing interest on the interest portion of the $482.79 damages award would be to award compound interest, which cannot be recovered against the United States absent express consent. *See United States v. Mescalero Apache Tribe*, 207 Ct.Cl. 369, 518 F.2d 1309, 1331 (1975) (recognizing that "[e]ven when simple interest is required to be paid by treaty or statute, all of the cases hold that compound interest cannot be allowed against the Government."); *Menominee Tribe of Indians v. United States*, 97 Ct. Cl. 158, 162, 1942 WL 4372 (1942) (recognizing that caselaw made it "clear that a statute consenting to payment of interest refers to simple interest only, and any obligation to pay compound interest cannot be implied from general words, but must be based upon clear and unequivocal language leaving no doubt as to the intention of Congress to depart from the general rule so announced as to the right to charge and collect interest from the Government."). Thus, the Court will require the parties to submit briefs and any supporting materials they desire to submit to propose an interest calculation. Accordingly,

IT IS ORDERED:

1. That defendant's oral Motion for Judgment as a Matter of Law, taken under advisement during the Court trial, is denied.

2. That Judgment will be entered in favor of plaintiffs Casimir LeBeau and Vernon Ashley and against defendant United States, on plaintiffs' claim for breach of trust, in the amount of $482.79 each plus interest to be determined by the Court, but Judgment will not be entered until after the Court has determined the proper amount of interest to be awarded to plaintiffs.

3. That plaintiffs shall file and serve a brief and any supporting materials, on or before August 19, 2002, proposing an interest calculation taking into account the rule that plaintiffs are not entitled to recover interest on any interest portion of the damages award. That defendant shall file and serve a response no later than ten (10) days after service of plaintiffs' submissions. That plaintiffs shall file and serve a reply no later than five (5) days after service of defendant's response.